**Belinda Victoria Debusk DEAN, d/b/a Specialty Ceramics and Molds, Plaintiff,**

v.

**Ben T. BURROWS, et al., Defendants.**

**No. CIV–3–87–087.**

United States District Court,
E.D. Tennessee, N.D.

Feb. 9, 1989.

David R. Stacey, Robert E. Pitts, R. Bradford Brittian, Pitts & Brittain, Knoxville, Tenn., for plaintiff.

Mark S. Graham, Andrew S. Neely, Luedeka, Hodges, & Neely, Knoxville, Tenn., for defendants.

Ben T. and Katie M. Burrows, pro se.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is an action for copyright infringement brought by the plaintiff, Belinda Dean, who does business as Specialty Ceramics and Molds, against Ben T. Burrows, Katie M. Burrows, individually and doing business as Action Molds, and Gary Bennett, Cheryl Bennett, individually and doing business as Bennett Molds. The plaintiff alleges that the defendants individually, through their businesses and through a conspiracy infringed a registered copyright in a sculptural work entitled by the plaintiff as the Pikl'd Pig (pig), which is a ceramic figurine of a sow drinking from a jug of moonshine liquor. The defendants, Gary and Cheryl Bennett, challenge the validity of the plaintiff's copyright. The remaining defendants, who are in bankruptcy, are subject to entry of a default

judgment against them pursuant to Rule 55, Fed.R.Civ.P.

## I. FACTS

This infringement action arose in the context of the ceramic crafts market. The competitors in this market range from multi-million dollar corporations to small dealers working out of their homes. One method of creating ceramic sculptures or figurines requires that a clay sculpture be created from which to produce a mold for casting reproductions of the sculpture. These reproductions are known as greenware. The molds are made from plaster and have a limited life for reproducing copies. The molds themselves can be copied through a process known in the industry as making a rubber block.

In 1980, Mr. William L. Wallace, Jr., created a sculpture of the Pikl'd Pig from clay and made a mold for casting greenware reproductions for public sale. The first copies of the sculpture were publicly sold in March, 1980. These copies bore a copyright notice in the form required by statute, 17 U.S.C. sec. 401(b); Mr. Wallace included the copyright notice in the mold from which copies were cast, but this copyright was not registered. Sometime between March, 1980, and February, 1984, a flood occurred at the residence of Mr. Wallace's parents, where his molds for casting figurines were located. The flooding caused the mold for the Pikl'd Pig and other of his creations to be damaged; however, the molds were salvageable.

In early 1984, the plaintiff approached Mr. Wallace and offered to purchase both the molds and his copyright in the works. The plaintiff and Mr. Wallace agreed to a transfer of the copyrights and molds for 15 sculptural works of his creation for $500.00. The plaintiff paid Mr. Wallace by a check, dated March 10, 1984, drawn on her Specialty Ceramics account and made payable to Larry Wallace. Mr. Wallace's endorsement is on the check and the cancelled check has the notation on its face that it was for "mold designs and molds." Mr. Wallace then agreed to work for the plaintiff to assist her in the cleaning and restoring of the flood-damaged molds so that new master molds could be created for casting greenware. During the difficult and time-consuming process of restoring the damaged molds and making new master molds, the plaintiff directed Mr. Wallace to make a number of changes in the Pikl'd Pig design. In addition to restoring details destroyed by the water damage to the original molds, Mr. Wallace was directed to make creative changes in the sculpture itself, namely to change the configuration of the pig's ears, to add lines representing hairs on the pig, and to round off the pig's back. The plaintiff requested that the ears be reconfigured because she did not like the design of the 1980 pig's ears. Among the changes were reducing the size of the ears, moving the left ear so that it did not fall over the face of the pig, and notching the ears. Aside from the other refinements and the reconfiguration of the ears, no other significant changes were apparently made in the 1980 design. A copyright notice bearing the year 1984 and Specialty Molds was placed on the new master mold and appeared on greenware copies made from the new master mold. Figurines of the redesigned pig were first sold publicly in 1984, bearing a copyright notice with that date; the first molds for making authorized copies were available for public sale in August, 1985.

The plaintiff, Belinda Dean, who married at age 14 and completed the 9th grade, first got involved in the ceramics business in 1975. She has continued to build her small ceramics business since that time and decided to begin making molds in early 1984. She purchased Mr. Wallace's original designs and hired him to assist her in making new master molds. Although the transfer of copyright ownership was memorialized at about the same time she paid him by check, the document was not dated; it was, however, written in Mr. Wallace's handwriting and stated the date of the transfer agreement in it. She began the registration process in the summer of 1985. Without any legal assistance, the plaintiff filled out the form for a certificate of copyright registration. She informed the Copyright Office that she had purchased the

copyright from the author, naming Mr. Wallace, and stated that the transfer was embodied in a written agreement. The date of first publication was listed as 1980. Because she failed to provide a copy of the written transfer of ownership agreement, the Copyright Office requested additional proof of ownership. She then had the transfer agreement signed by herself and Mr. Wallace and notarized on November 8, 1985. She provided this information to the Copyright Office and the copyright was then duly recorded on November 21, 1985. Although the date of first publication was 1980, the 1984 design was used in the pictures provided to the Copyright Office. The 1980 design was incorporated into the 1984 design. The notice in the photographs provided to the Copyright Office, however, states a 1980 date and names Specialty Molds. At the time of registration, no 1980 pig was evidently available to use in the photographs.

In addition to being the author of the Pikl'd Pig, Mr. Wallace testified as an expert in the field of ceramic crafts. He stated that unauthorized copying is a significant problem in the ceramics market. Since creation of original designs is expensive, time-consuming, and requires talent, skill, and originality, pirating of designs deprives legitimate artists and dealers of a fair return on their investments. Unfortunately, unauthorized copying is relatively simple because molds can be inexpensively reproduced by the rubber-block method. Mr. Wallace's testimony in this regard was corroborated by that of another expert called by the plaintiff, Mark C. Denno, President of Doc Holiday's Ceramic Products. Mr. Denno noted that because copiers are hard to trace and because infringement actions are so expensive, not many infringement cases are prosecuted in the ceramic crafts industry. Furthermore, the economic damage done to smaller dealers is much greater, depending on how many of their molds are pirated. Another expert, Patrick J. Langdell, President of Sioda Ceramics, also testified for the plaintiff, and further corroborated testimony on the investment of time, money, and creativity necessary to design and produce ceramic molds and on the significant problem presented by unauthorized copying of molds. Lost sales in the ceramics industry due to pirating represents about three-to-five percent of the industry's total sales. Moreover, pirates sell inferior quality products that harm the reputation of legitimate dealers. The experts agreed that pirates do not tend to keep records of of their sales.

Shortly after the plaintiff's Pikl'd Pig mold was made available to the public, Ms. Wanda Yardley purchased an authorized mold from Specialty Ceramics in August, 1985. In November, 1985, she encountered the defendant Ben T. Burrows, who asked her to sell him the pig mold. Ms. Yardley refused to sell the mold. The following month, Mr. Burrows approached one of the owners of Gene and Margie's Ceramics, Daniel E. Woodcock, Sr., who had witnessed Ms. Yardley refuse to sell the pig mold to Mr. Burrows, and asked that Mr. Woodcock purchase a pig mold from Specialty Ceramics. Mr. Woodcock agreed to make the purchase for Mr. Burrows and when he delivered it to him, Mr. Burrows stated that he was going to make some alterations in it for copying it. Mr. Burrows asked that Mr. Woodcock not say anything to anyone about it. A receipt dated December 16, 1985, reflects the purchase of one of the plaintiff's pig molds by Mr. Woodcock. Later, Mr. Burrows showed Mr. Woodcock a cast greenware copy of the Pikl'd Pig and boasted that he could copy any mold. Mr. Woodcock's wife, Evelyn Woodcock, also witnessed Ms. Yardley refuse to sell the pig mold to Mr. Burrows. She recalled that Mr. Burrows asked her husband to purchase a mold for him.

Although Mr. Burrows is a defendant in this action, having defaulted, he did not present any defense but he was called by the plaintiff to testify. On the stand he admitted selling eight-to-ten copies of the Pikl'd Pig but denied purchasing the original mold from Mr. Woodcock and denied knowing or recognizing either Mr. Woodcock or Ms. Yardley. Mr. Woodcock, however, stated that Mr. Burrows was a regu-

lar visitor to his shop and recognized Mr. Burrows. According to Mr. Burrows, he left the ceramic mold business in August, 1986, and destroyed all his records. Three action mold invoices were introduced showing three separate sales of molds to Marge Green of Shelbyville, Tennessee: In February, 1986, which invoice lists a mold called "Pig with a Bottle", September, 1986, and October, 1986. Two of these sales occurred after Mr. Burrows supposedly left the ceramics business. Although Mr. Burrows claims that he continued to dispose of his left-over inventory of molds during the remainder of 1986, he admitted teaching a mold-making class in 1987. Mr. Burrows testified that he obtained a copy of the plaintiff's pig mold from a man in a dark-colored van in a trade in Georgia. The man called himself "Obie"; he never saw him again.

Regarding the defendants, Gary and Cheryl Bennett, Mr. Burrows testified that he has known them since 1984. Mr. Bennett was a student in a mold-making class he taught sometime during 1984. For a short time in 1984 or early 1985, he and Mr. Bennett traded a few molds and went on several selling excursions; he may have purchased some supplies from Mr. Bennett in early 1985 or possibly 1986, but he had no recollection of selling any supplies to Mr. Bennett. Mr. Burrows kept few records while in business and apparently destroyed what records he had in 1986. He disclaims having any samples of cast greenware of the Pikl'd Pig and stated that he did not have the molds very long before trading or selling them.

The defendants Gary and Cheryl Bennett readily admitted in their answers to the plaintiff's interrogatories that they sold two molds of a pig, which they called "Pig with a Jug," substantially similar to the plaintiff's Pikl'd Pig. One mold was sold to Elizabeth Shaw for $7.20 on February 22, 1986, at Ms. Shaw's shop in Georgia. The other mold was sold to Clora Swann for $10.80 on the same day and at the same shop. The Bennetts maintained records of their transactions and only two sales of molds substantially similar to that of the plaintiff are reflected in these records; the sales totalled $18.00.

Mrs. Bennett testified that she had never heard of the plaintiff or Specialty Ceramics until March, 1986. At that time, she and her husband were looking for hillbilly figures to sell with their own original mold of an outhouse and were eventually led to Specialty Ceramics, from whom they obtained a brochure. In April, 1986, while on a sales and trading trip to Knoxville from her home in Chattanooga, she bought two molds from the plaintiff. This was the only contact she had with the plaintiff. In the course of her conversation with Mr. Wallace while at the plaintiff's shop in Knoxville, Mr. Wallace asked her if she knew anyone in Chattanooga who made molds. Mrs. Bennett told Mr. Wallace that her husband made molds. He then asked her if she knew Mr. Burrows and she told him that Mr. Burrows taught her husband how to make molds and that they had traded some molds together briefly. Mr. Wallace commented to her that Mr. Burrows had a reputation as a copier. Mrs. Bennett testified that she and her husband knew the defendants Ben and Katie Burrows and socialized with them; however, they had no enduring business relationship.

The defendant Gary Bennett testified that he learned how to make molds in a class taught by Mr. Burrows in about 1984 and traveled with him on three-to-five sales and trading trips to learn how the ceramics business was conducted. Mr. Bennett began selling molds in early 1985. He occasionally sold some excess plaster or rubber to Mr. Burrows in 1985 and part of 1986. Mr. Bennett testified that he obtained the mold of the pig from a man selling out of a dark-colored van; he traded eight-to-ten molds with this man but could not recall much about the transaction. He corroborated his wife's testimony that they sold only two molds substantially similar to the plaintiff's Pikl'd Pig; this testimony is borne out by the Bennetts' records, which they maintained and produced during discovery. Mr. Bennett testified that they did not continue in the ceramics business for long because they lost money; he treated it more as a hobby than as a business. By

the end of 1987, they had ceased doing business as Bennett Molds because it was more work than it was worth. After a brief period of trading, his contacts with the Burrows were social and not business, although he did occasionally sell some excess materials he had to Mr. Burrows.

The testimony of Mr. Wallace corroborates that Mrs. Bennett came to the plaintiff's shop in April, 1986, and purchased two molds. He stated that Mrs. Bennett admitted knowing Mr. Burrows and that Mrs. Bennett told him Mr. Burrows taught her husband how to make molds. They briefly discussed Mr. Burrows' reputation as a copier. In August, 1986, the same month Mr. Burrows claims he left the ceramics business and destroyed his records, Mr. Wallace and Mr. Burrows had a confrontation at a Knoxville crafts show about Mr. Burrows' alleged unauthorized copying of Specialty Ceramics' molds. Mr. Burrows admitted to him that he had obtained some eight-to-ten molds of the plaintiff's in a swap and had subsequently sold them, but he asserted that he had never copied them. In her testimony, the plaintiff stated that she first became aware that unauthorized copies of the Pikl'd Pig were being sold at a trade show in Atlanta in March, 1986. Since that time and up until time of trial, she and Mr. Wallace have attempted to locate and recover the pirated copies of the mold and any cast greenware.

Both parties offered selected deposition testimony as further evidentiary support for their positions. The plaintiff's deposition proof included that of Clora L. Swann, one of the women who purchased molds from Mr. and Mrs. Bennett substantially similar to the plaintiff's Pikl'd Pig mold. A Bennett Mold's invoice of the sale was dated February 22, 1986, for $10.80. She purchased this mold at Elizabeth Shaw's shop in Atlanta. The deposition of Elizabeth Shaw was offered as well. A second Bennett Mold's invoice, also dated February 22, 1986, recorded a sale to Ms. Shaw of a pig with a jug mold for $7.20. When she was contacted by Specialty Ceramics, she returned the unauthorized mold of the pig to Specialty Ceramics and was provided an authorized mold with a copyright notice affixed. The two molds differ in the quality of plaster used. Although Ms. Shaw recalls being called by Mrs. Bennett after the initiation of this infringement action, she could not recall exactly what was said. Ms. Shaw testified that she had no reason to know that the pig mold she obtained from the Bennetts was an unauthorized copy.

Another witness offered by deposition, Bonita Askew, testified that during the time she owned a ceramics shop in Birmingham, she did business occasionally with Mr. Burrows and Action Molds. She purchased a Pikl'd Pig mold from Mr. Burrows and was under the impression that he had made it until another mold salesman recognized it as belonging to Specialty Ceramics. This salesman had Mr. Wallace contact her about it; on Mr. Wallace's request, she returned the unauthorized mold together with her receipt from Mr. Burrows to Specialty Ceramics. The mold she purchased from Mr. Burrows did not carry a copyright notice. In a similar vein is the testimony of Leigh McDonald, who was also in the ceramics business in Birmingham and did business with Mr. Burrows. She purchased a Pikl'd Pig mold from Mr. Burrows, who represented that it was his mold; she did not know it was the plaintiff's mold until another person recognized it as an unauthorized copy of a Specialty Ceramics' mold. She called Mr. Wallace and complied with his request to return the mold. Ms. McDonald does know the Bennetts and had never done business with them. The deposition testimony of Ray Shrum, who has been in the ceramics business for over nine (9) years, shows that he also did business with Mr. Burrows, who also taught him how to make rubber blocks. Mr. Shrum never did any business with the Bennetts and had never met them, but he had heard of Bennett Molds because Mr. Burrows showed him a trade magazine in which the Bennetts' advertised their outhouse mold. Mr. Burrows told him that he taught a class in which Mr. Bennett learned how to make molds.

As their deposition proof the Bennetts submitted the testimony of Lena Foutch,

who testified that she once bought ceramic figures from a traveling peddler named Doug Cooper in March, 1986. Mr. Cooper drove a dark-colored van and showed her a number of greenware figurines, including several coal miners, of which she purchased six (6). She did not purchase the mold for the coal miner. This coal miner was a copy of another of the plaintiff's molds. Ms. Foutch's testimony corroborates the trial testimony of Gertrude Smith, who runs a ceramics shop in Lake City, Tennessee. She testified that she buys molds from traveling peddlers as well as acts as a dealer for mold companies. She stated that in 1986 a free-lance mold salesman came by her shop and sold her pirated copies of the Specialty Ceramics' coal miner figure. The man drove a dark-colored van and she recalled his name as being Cooper. In her experience, many molds do not carry copyright notices and the lack of one would not be unusual.

Three character witnesses testified at trial on behalf of the Bennetts as well. The three, Lewis B. Perfetti, a Chattanooga elementary school principal, and two neighbors, Max Paris and Bob May, who are local businessmen, have known the Bennetts in various circumstances for periods ranging from over two years to many years. All three stated unequivocally that the Bennetts had reputations for honesty and truthfulness in their community. From their demeanor on the stand, their testimony, the evidence as a whole, and the testimony of these character witnesses, the Court finds that Gary and Cheryl Bennett are wholly credible witnesses.

## II. CONCLUSIONS OF LAW

A. *Validity of Plaintiff's Copyright:*

The defendants have challenged the validity of the plaintiff's copyright for the Pikl'd Pig. Although the plaintiff has a certificate of registration of her copyright, if the defendant raises doubt as to the validity of the copyright, the weight accorded a certificate is within the discretion of the Court. 17 U.S.C. sec. 410(c). *See also Dolori Fabrics, Inc. v. Limited, Inc.,* 662 F.Supp. 1347, 1352 (S.D.N.Y.1987).

That the Pikl'd Pig is of itself copyrightable is clear. 17 U.S.C. sec. 101 (pictorial, graphic, or sculptural works defined); 17 U.S.C. sec. 102(a)(5). The sculpture is obviously original within the meaning of Copyright Act in that it owes its origin to the artist and is not merely a copy of something else. *See, e.g., Kamar International, Inc. v. Russ Berrie and Company,* 657 F.2d 1059 (9th Cir.1981). The Pikl'd Pig as initially created by Mr. Wallace in 1980 was an original work of authorship and ownership of the copyright vested by statute in Mr. Wallace at the time of its creation. 17 U.S.C. sec. 201(a); 17 U.S.C. sec. 302(a). Mr. Wallace did not record his copyright but he did place a copyright notice on the publicly-distributed copies of the pig and this notice was in the statutory form. 17 U.S.C. sec. 401(a), (b).

Nevertheless, the defendants contend that because the plaintiff uses 1984 as the date of first publication in the copyright notice on those Pikl'd Pigs distributed by Specialty Ceramics and because this date is not the date of first publication, the notice is defective under 17 U.S.C. sec. 406(b). The defendants, therefore, conclude that this Court should treat the case as one in which the date of first publication has been omitted on an authorized copy. 17 U.S.C. sec. 405.

First, the plaintiff has duly registered her copyright and informed the Copyright Office of the date of first publication, 1980. Once the plaintiff acquired the copyright from Mr. Wallace, she hired Mr. Wallace to make certain artistic changes in the sculpture. The changes made in the 1980 pig were of such significance as to constitute a derivative work and those changes were first published in 1984. The 1984 pig incorporated the 1980 pig into its design. As the copyright owner of the 1980 pig, under 17 U.S.C. sec. 106, the plaintiff had the exclusive rights not only to reproduce copies of the pig, 17 U.S.C. sec. 106(1), but "to prepare derivative works based upon the copyrighted work," 17 U.S.C. sec. 106(2). Notice was never omitted from any copy publicly distributed. Second, and more importantly perhaps, the plaintiff registered

the copyright without the assistance of legal counsel. The use of the 1984 date, even if the Court would agree with the defendants' theory, has not been shown to be anything but innocent and was "not done for a fraudulent purpose such as falsely asserting priority or improperly seeking to extend copyright duration," *E. Mishan and Sons, Inc. v. Marycana, Inc.*, 662 F.Supp. 1339, 1344 (S.D.N.Y.1987). In *E. Mishan and Sons, Inc.*, a similar circumstance occurred in which the copyright owner used a series of dates in the notice due to a lack of legal advice. *Id.*, at 1341. No prejudice to any other person or party had been shown to have resulted from the use of the latter date, *id.*, at 1344, and the District Court refused to invalidate the copyright on this ground based on the equities of the case. Given that the plaintiff owned both the 1980 and 1984 pigs, this Court finds that the plaintiff's use of the 1984 date in the notice, which is the date of first publication of the derivative work, does not invalidate her copyright. *Cf. Eckes v. Card Prices Update*, 736 F.2d 859, 861–862 (2nd Cir.1984) (inadvertent and innocent omissions in copyright application not fatal to validity). Moreover, the copyright was registered in 1985, within five (5) years of the year of first publication in 1980, 17 U.S.C. sec. 405(a)(2), and is thus within the savings provision of the statute.

■ The defendants next argue that the plaintiff failed to inform the Copyright Office of the pre-existing 1980 pig and that this amounts to a misrepresentation that invalidates her registration. In this regard, the defendants rely on the amateurish method of transfer between Mr. Wallace and the plaintiff to support their argument that the transfer did not in fact occur in 1984 and actually occurred in November of 1985, after the plaintiff first applied for copyright registration.

The Court rejects this argument. First, the check written by the plaintiff to Mr. Wallace was clearly negotiated, posted, and cancelled in March, 1984. This check is endorsed by Mr. Wallace and has the notation that it was written for "mold designs and molds." The check itself complies with the requirements of 17 U.S.C. sec. 204(a) in that it constitutes "a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed...." Nevertheless, both the parties to the transfer testified in open court that the transfer occurred in March, 1984, and that a written transfer agreement was prepared in March, 1984. This agreement was duly recorded in the Copyright Office. The delay between March, 1984 and November, 1985 in having the transfer agreement notarized was again due to the lack of legal advice on the technicalities of copyright law. The Court finds that the plaintiff acted in good faith in her dealings with the Copyright Office. Second, contrary to the defendants' contention, the plaintiff explicitly stated in her copyright application that she obtained the Pikl'd Pig from Mr. Wallace by a written agreement and that the year of first publication was 1980. Consequently, no misrepresentation to the Copyright Office occurred. Any irregularities, if they may be so strongly characterized as such, were attributable to the lack of legal counsel and not to any fraudulent intent on the part of the plaintiff. *See Eckes v. Card Prices Update, supra*, at 861–862.

Accordingly, the Court holds that the plaintiff has a valid copyright in the Pikl'd Pig; that in the exercise of her exclusive rights of ownership of the 1980 pig, the plaintiff had a derivative work incorporating the 1980 pig made; that the 1984 pig is a derivative work because the 1980 and 1984 pigs are sufficiently distinct; and that the plaintiff has in good faith complied with the requirements and purposes of the Copyright Act. In its discretion, the Court finds that the presumption of validity afforded by the certificate of registration has not been rebutted by the defendants. 17 U.S.C. sec. 410(c). *See also Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2nd Cir.1980).

**B.** *Infringement:*

The burden of establishing a case of infringement requires the plaintiff to show "that (1) he owns the copyright in the work in question, (2) the defendant had access to the copyrighted work, and (3) there is 'sub-

stantial similarity' not only in the general ideas of the works but of the expression of those ideas as well." *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 318 (9th Cir. 1987) (citations omitted). Two sets of alleged infringers are involved. The plaintiff has attempted to demonstrate a conspiracy to infringe to establish joint and several liability for the alleged infringement. The Court addresses each set of alleged infringers separately.

### 1. The Bennetts:

■ From the outset, the Court finds that the proof is insufficient to establish the existence of any conspiracy between the Bennetts and the Burrows. In *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 434–435, 104 S.Ct. 774, 784–85, 78 L.Ed.2d 574 (1984), the United States Supreme Court observed that

> "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another.... [But] vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader of the problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another."

This Court concludes that the mere showing that the Bennetts and the Burrows had a social relationship, lived in the same city, and had a few isolated business transactions is not sufficient proof of conspiracy to make the Bennetts liable for the infringements committed by Mr. Burrows. Guilt by association cannot support a conclusion of conspiracy. If any liability for infringement attaches to the Bennetts for their activities, that must be considered separately from the liability of Mr. Burrows. *Cf. MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2nd Cir.1981) (limitations on joint and several liability discussed).

■ The existence of the plaintiff's valid copyright has been established in the foregoing section of this Opinion. Moreover,

the defendants' have admitted that they sold two (2) molds substantially similar to the plaintiff's Pikl'd Pig. These molds were sold for a total of $18.00. The plaintiff has not shown that the Bennetts sold any other molds; unlike Mr. Burrows, the Bennetts maintained fairly adequate records and produced those records during discovery. The Bennetts have denied making any other sales and the Court has found them to be completely credible. Mr. Bennett testified that he obtained the molds from a man in a dark-colored van. This testimony was corroborated by at least two other witnesses with similar experiences. The proof in the case does not show that Mr. Bennett copied those molds and only shows that he purchased them and subsequently resold them for a meager amount of money. The Bennetts are in no different situation than the other persons from whom the plaintiff has recovered unauthorized copies of the Pickl'd Pig mold and who also purchased these molds from the man in the dark-colored van or from Mr. Burrows.

The evidence does not support an inference of access, although the Court recognizes that "[p]roof of access requires only 'an opportunity to view or to copy plaintiff's work.' ... And 'evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant....' " *Kamar International, Inc. v. Russ Berrie and Company, supra*, at 1062 (citations omitted). Nevertheless, access is a question of fact. The Bennetts' testimony and that of the other witnesses demonstrate that the Bennetts obtained and sold the two molds prior to having any knowledge of the plaintiff's pig.[1] Prior to February 22, 1986, the molds were obtained by Mr. Bennett in a trading transaction common in the ceramic crafts market and did not bear a copyright notice because they were pirated. The only period in which Mr. Bennett traded molds with Mr. Burrows was for a short time in early 1985; however, Mr. Woodcock and Mrs.

---

1. The testimony of the plaintiff, Mr. Wallace, and Mrs. Bennett place Mrs. Bennett at Special-

ty Ceramics in April, 1986, after the sales of the two molds by the Bennetts in February, 1986.

Woodcock both recall purchasing the pig mold for Mr. Burrows in December, 1985. While Mr. Bennett could not remember many details, including the date, of the trade in which he obtained the pig molds from the man in a van, two other witnesses, who also obtained unauthorized molds from an itinerant peddler in a dark-colored van, placed the transactions in 1986; one placed it in March, 1986. This would proximately coincide with the date of both the Bennetts' sales of the molds on February 22, 1986, in Atlanta, Georgia. Mr. Burrows did, however, also sell an unauthorized pig mold to Marge Green on February 22, 1986, in Shelbyville, Tennessee, shortly after he obtained an authorized copy through Mr. Woodcock.

In view of this Court's conclusion below that Mr. Burrows was a willful infringer, that Mr. Burrows was concurrently selling pirated copies of the plaintiff's pig is coincidental but unrelated to the isolated sales made by the Bennetts in February, 1986. Mr. Burrows, who has admitted to making eight-to-ten sales of copies of the plaintiff's molds, engaged in a continuing pattern of infringement but no such conduct has been demonstrated on the part of the Bennetts, "whose role in [any] infringement was minimal at best and whose liability was questionable." *MCA, Inc. v. Wilson, supra,* at 187 (citations omitted). The Court, therefore, concludes that the plaintiff has failed to establish access to the plaintiff's copyrighted work.

■ At worst, the Bennetts could be considered innocent infringers who should be afforded the protection of 17 U.S.C. sec. 405(b) in view of the failure of the plaintiff to prove that the Bennetts had access to the pig. Moreover, the two sales made by the Bennetts were isolated events and they clearly did not engage in any conduct that, assuming for argument that they had access, constituted a continuing scheme of infringement. In the ceramic crafts market many figurines do not carry copyright

notices and the omission of the notice from the pirated copies obtained and sold by the Bennetts caused them to be misled. No earlier than March, 1986, could the Bennetts have had reason to know the pig was subject to copyright protection. If their conduct could be considered infringement, it would clearly be innocent and at best the plaintiff has shown nothing more than a *de minimis* violation of the Copyright Act by the Bennetts; however, assuming that the plaintiff made out an action for infringement, the Court would conclude that the Bennetts are within the policy and purpose of 17 U.S.C. sec. 405(b). *Cf. Canfield v. Ponchatoula Times,* 759 F.2d 493, 498 (5th Cir.1985) ("Because [works falling within sec. 405(a) ] are protected, it would be possible for a republisher to infringe the copyright, even though the work lacked notice. To avoid this inequitable situation, sec. 405(b) removes liability for statutory and actual damages from innocent infringers who are misled by the lack of notice").[2] Under all the circumstances shown on this record, the Court cannot conclude that the Bennetts are liable for any amount of statutory damages to the plaintiff.

2. The Burrows:

■ The record in this case is clear and convincing that Mr. Burrows is liable for willful infringement of the plaintiff's copyright. He fraudulently obtained an authorized copy of the pig in December, 1985, removed the copyright notice, and then engaged in an intentional pattern of willful infringement by copying and selling the plaintiff's Pickl'd Pig. Several witnesses testified that Mr. Burrows sold them copies of the plaintiff's pig. By his own admission, Mr. Burrows sold eight-to-ten unauthorized copies of the plaintiff's molds and the record supports the inference that he actually copied and sold additional pigs.

The Court has found that parts of Mr. Burrows' testimony were not credible. His story that he also obtained the plaintiff's pig from a traveling mold peddler in a

---

**2.** The Court is aware of 17 U.S.C. sec. 405(c), which provides that copyright protection is not lost by unauthorized removal of the copyright notice, and of 17 U.S.C. sec. 504(c)(2), which

distinguishes between innocent infringement in reliance on lack of notice on an authorized copy and on lack of notice on an unauthorized copy.

dark-colored van is not only directly contradicted by the testimony of two witnesses and differs in some respects from the testimony of those who did obtain molds from a man in a dark-colored van, but the conclusion that he obtained the mold for fraudulent purposes is also supported by a Specialty Ceramics invoice dated December 16, 1985, to Gene and Margie's Ceramics for a pig mold and by the testimony of Wanda Yardley, who refused to sell an authorized copy of the pig to Mr. Burrows in November, 1985. Furthermore, unlike the Bennetts, who attempted in good faith to maintain adequate records of their business transactions, Mr. Burrows did not maintain sufficient records and destroyed what records he did have. Mr. Burrows claims to have left the ceramic crafts business in August, 1986, and the Court does not believe that the subsequent destruction of Mr. Burrows' records was merely coincidental in light of the confrontation between Mr. Burrows and Mr. Wallace about Mr. Burrows' infringing activities, which confrontation also occurred in August, 1986.

Under 17 U.S.C. sec. 504(c)(2), the Court has the discretion to award statutory damages for willful infringement in the amount of not more than $50,000.00. While the evidence does not demonstrate that Mrs. Burrows participated in Mr. Burrows' scheme of infringement, she has neither defended in this action nor resisted entry of a default judgment against her. The Court assesses statutory damages against the Burrows in the maximum amount allowed by statute, $50,000.00. A default judgment in this amount shall be entered against the Burrows, who are jointly and severally liable to the plaintiff for this sum.

## C. Attorneys' Fees:

The plaintiff and the Bennetts have both moved for costs and attorneys' fees as the prevailing party under 17 U.S.C. sec. 505. The record contains the lodestar affidavits of the attorneys for the plaintiff and for the Bennetts. These affidavits reveal that the Bennetts, who were represented by the firm of Luedeka, Hodges, and Neely, have accumulated fees and costs in the defense of this action in the amount of $22,758.06.

The plaintiff was represented by the firm of Pitts and Brittian; the fees and costs accrued by the plaintiff amounted to $35,-874.62.

The Bennetts take the position that the plaintiff has unreasonably pursued the prosecution of this infringement action against them even after discovery, in which the Bennetts fully cooperated, revealed that their participation in any infringement by the Burrows was groundless or questionable at best and that if they had in fact otherwise infringed the plaintiff's copyright, it was a de minimis and innocent violation of the Copyright Act. The Bennetts also argue that if the Court found in their favor they would be the prevailing party within the meaning of 17 U.S.C. sec. 505. The plaintiff contends that her action against the Bennetts was not prosecuted unreasonably or without good faith and that she had grounds to believe that the Bennetts and the Burrows had engaged in a conspiracy to violate her copyright. The plaintiff also argues that she should be awarded attorneys' fees as the prevailing party.

 The Copyright Act allows the Court to exercise its discretion in awarding attorneys' fees and costs as part of the remedy for infringement. 17 U.S.C. sec. 505; *Original Appalachian Art Works, Inc. v. McCall Pattern Company*, 825 F.2d 355, 356–357 (11th Cir.1987). Attorneys' fees may also be awarded to a defendant when the Court finds that an action was frivolous or prosecuted in bad faith. *McCulloch v. Albert E. Price, supra*, at 322. Whether attorneys' fees should be awarded to a prevailing plaintiff depends in part on whether the defendant was a willful or an innocent infringer. *Id.*, at 322. Moreover, court's have made a distinction between prevailing plaintiffs and prevailing defendants and have concluded that because an infringement action is favored to preserve copyright viability, awards to prevailing defendants are disfavored absent a frivolous or bad-faith prosecution. *Diamond v. AM–Law Publishing Corp.*, 745 F.2d 142, 148–149 (2nd Cir.1984). *See also Dolori Fabrics v. Limited, Inc., supra*, at

1357–1358. Attorneys' fees have, however, been more favored when the plaintiff is a small business and the losing party has demonstrated willful infringement. *Id.*

■ In view of this Court's findings and conclusions that the plaintiff has not shown that the Bennetts had access to her pig and that, assuming they had access, the Bennetts are at worst, if at all, innocent infringers, an award of attorneys' fees against the Bennetts would not be appropriate. Conversely, the Court does not find that the plaintiff pursued her prosecution of the Bennetts in bad faith; the action presented a genuine issue for the Court to resolve and was not, therefore, frivolous. Consequently, no award of attorneys' fees to the Bennetts against the plaintiff would be appropriate as well.

■ These conclusions do not, however, settle the question of an award of attorneys' fees to the plaintiff against the Burrows. The proof certainly establishes that Mr. Burrows fraudulently and willfully infringed the valid copyright of the plaintiff. Mr. Burrows knew precisely what he was doing and that such conduct was violative of the rights of the plaintiff as owner of the copyright in the Pickl'd Pig. Under the circumstances, the Court concludes that an award of the plaintiff's fees and all costs would be wholly justified. The Court awards the plaintiff her attorneys' fees and costs against the Burrows in the amount of $35,874.62.

### III. CONCLUSION

Accordingly, the Court finds that the plaintiff has demonstrated the validity of her copyright in the Pickl'd Pig. The plaintiff acted in good faith in her dealings with the copyright office; any minor mistakes she made were attributable to lack of legal counsel. After acquiring the rights to the Pickl'd Pig, the plaintiff had a derivative work created by incorporating certain artistic changes into the original pig. The copyright owners have publicly distributed copies that bore a copyright notice.

As regards the plaintiff's claims of infringement, the Court finds that the plain-

tiff's proof fails to establish the existence of a conspiracy of the Bennetts and the Burrows to infringe her copyright and treats the two sets of defendants separately. First, although the proof has shown that the plaintiff had a valid copyright and that substantial similarity existed between the molds sold by the Bennetts and that of the plaintiff, the plaintiff has failed to carry the burden on the issue of access. In February, 1986, the Bennetts sold two pirated copies of molds for the plaintiff's Pickl'd Pig for $18.00 after obtaining them in the ordinary conduct of the ceramic crafts business. Lack of notice on molds is common in the ceramics market and the Bennetts were misled by this lack of notice. No proof warrants a finding that the Bennetts could have been aware of the protected status of the plaintiff's pig prior to March, 1986. While Mr. Burrows had access to the pig in December, 1985, the Bennetts had not traded molds with him since early 1985, and thus could not have obtained the unauthorized copies of the plaintiff's mold from Mr. Burrows.

The liability of Mr. Burrows for infringement is clear. He obtained an authorized copy of the pig for the purpose of pirating it; this copy had a notice on it and Mr. Burrows was not misled by any alleged defects in the plaintiff's copyright notice. His infringement is willful and justifies assessment of the full extent of statutory damages authorized under the Copyright Act. Both Ben and Katie Burrows are subject to default judgments in this case and are jointly and severally liable for the damages.

Both the plaintiff and the Bennetts have sought an award of attorneys' fees as the prevailing party. Given the facts of this case, an award of attorneys' fees to either the plaintiff or the Bennetts is inappropriate as between these parties; however, the plaintiff has prevailed in every respect against the defendants Burrows and the proof certainly justifies a full award of attorneys' fees from the Burrows to the plaintiff.

■ Finally, the Court has concluded that the plaintiff has not established a

cause of action under the Lanham Act, 15 U.S.C. sec. 1125. This case does not differ from *Kamar International, Inc. v. Russ Berrie and Company, supra,* at 1063–1064, in this regard.

The Court, therefore, ORDERS:

1. That judgment be entered for the defendants Bennetts on the issue of their liability for infringement.

2. That a default judgment be entered against the defendants Burrows in the amount of $50,000.00.

3. That attorneys' fees and costs are awarded to the plaintiff from the defendants Burrows in the amount of $35,874.62.