PLAYBOY ENTERPRISES, INC., and
Special Editions, Ltd., Plaintiffs,

v.

Jennifer DUMAS and Jennifer
Dumas, Inc., Defendants.

No. 91 Civ. 6268 (CHT).

United States District Court,
S.D. New York.

Sept. 9, 1993.

Norwick & Schad, New York City (Kenneth P. Norwick, Danielle G. Mazur, Anne Chehebar, of counsel), for plaintiffs.

Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City (Roger L. Zissu, Lisa Pearson, Laurence S. Rickles, of counsel), for defendants.

## OPINION AND ORDER

TENNEY, District Judge.

Plaintiffs Playboy Enterprises, Inc. ("PEI") and Special Editions, Ltd. ("SEL") are Delaware corporations having their principal places of business in Chicago, Illinois (hereinafter, collectively "Playboy"). They bring this action seeking a declaratory judgment that PEI is the sole owner of all right, title, and interest in all copyrights of approximately 285 works of art created by Patrick Nagel which appeared in PEI's publication, *Playboy*, between 1974 and 1984. SEL is a wholly owned subsidiary of PEI to which PEI has transferred its rights, if any, in the Nagel works. Defendant Jennifer Dumas, a New York citizen, is Nagel's widow. Defendant Jennifer Dumas, Inc. ("JDI"), is a California corporation with its principal place of business in New York City since 1986. Dumas controls and licenses the uses of the copyrights and related ownership rights that she obtained in Nagel's artworks upon his death through JDI (hereinafter, collectively "Dumas" unless otherwise specified). Du-

mas assigned all of her copyrights in Nagel's works to JDI in 1988. Defendants have brought counterclaims alleging copyright infringement, unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and reasonable attorney's fees under the United States Copyright and Trademark Acts. This court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a). For the reasons set forth below, plaintiffs' claim for a declaratory judgment is dismissed; defendants' counterclaim for infringement is granted with defendants being awarded $42,357.95; defendants' counterclaim under the Lanham Act is dismissed; and defendants are awarded attorneys' fees for preparation of the copyright infringement counterclaim.

## BACKGROUND

Patrick Nagel was a successful freelance artist whose main body of work consisted of acrylic paintings on either illustration board or canvas. In 1974, Nagel began producing pieces of art for *Playboy* magazine. Over the following years, until his death in 1984, Nagel produced approximately 300 works that appeared in the magazine. In producing these works, Nagel used his own equipment, tools, and materials; he worked in his own studio, on days and at times of his choosing; he hired his own assistants to work for him in the studio. At no time did PEI withhold income tax or pay Nagel employee benefits. Pre-trial Memorandum dated April 9, 1993, Stipulated Facts (hereinafter "PTM Stip. F.") ¶¶ 49–53. Throughout his career, he produced art for a variety of other businesses including American Express and Bank of America. *Id.* at ¶ 18. He also painted privately commissioned works and exhibited his work in galleries. These activities took place while he was producing works that appeared in *Playboy*.

The exact nature of the work relationship between Nagel and Playboy is disputed. The parties have stipulated that "Nagel accepted assignments from *Playboy*, created illustrations, and delivered them to [Playboy]. . . ." *Id.* at ¶ 34. Plaintiffs believe this fact should be read conjunctively, *i.e.*, that upon receipt of an assignment, Nagel created

a specific illustration. Defendants argue that, for the most part, Nagel usually created artworks within general parameters which Playboy then bought as final works for publication in its magazine. The court discusses the relationship at length, *infra* at pp. 310–311. What is clear is that Nagel accepted some specific assignments, at least until 1976. However, as time went on, he was given greater freedom to submit the paintings he wanted, which apparently matched what Playboy was interested in publishing. At least one work by Nagel appeared in every issue of *Playboy* from August 1975 until July 1984. (Pl.Exh. 22; Def.Exh. A).

From the outset, Playboy kept all of the original artwork that was created for and delivered to it by contributors. PTM Stip.F. ¶ 25. By 1977, Playboy had amassed more than 4,000 pieces of art. Tr. 238. Because of space considerations, Playboy adopted a new policy, effective April 1, 1977, of returning the original works to the contributors. Tr. 124–25; PTM Stip.F. ¶ 26. On the back of each work returned to Nagel after April 1977 was a stamped legend in capital letters:

PLAYBOY'S ARTWORK
REPRODUCTION
PROHIBITED WITHOUT
PLAYBOY'S PERMISSION

PTM Stip.F. ¶ 66.

During the decade-long relationship with Nagel, Playboy issued approximately 258 checks for his works. . Playboy issued a check for a particular painting after it had received the work from Nagel. *Id.* at ¶ 33. Each check bore a legend-endorsement, although there were three different endorsements in use over the period in question.[1] These checks were endorsed and deposited by Nagel himself, his bank, his corporation, or his accountant.[2] These endorsed checks constitute the only writing signed by Nagel or his artist's representative or accountant relating to Playboy's ownership of the copyrights in the works produced for *Playboy*. *Id.* at ¶ 32.

Between 1974 and 1984, Playboy paid artists for works created for use in its magazine on a scale that varied according to the size of the reproduction of the work: $250 per spot illustration; $800 per full page illustration; and $1,200 per double page spread. *Id.* at ¶¶ 35–36. *Playboy* magazine's art director, Tom Staebler, indicated that an "honorarium" was also sometimes paid when a work was republished. Tr. 123, 272–73.

Nagel also took steps to market his other artwork, some of it similar to the work ap-

---

1. Between 1974 and approximately July 1979, during which time over 104 checks were issued, the legend-endorsement [hereinafter "Legend A"] read:

 Any alteration of this legend agreement voids this check. By endorsement of this check, payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title, and interest in and to the following items: [a description followed]

 For the period between September 1979 and approximately March 1981, when roughly 60 checks were issued to Nagel by Playboy, the legend agreement [hereinafter "Legend B"] read:

 Any alteration of this legend agreement voids this check. BY ENDORSEMENT, PAYEE: acknowledges payment in full for services rendered on a work-made-for-hire basis in connection with the Work named on the face of this check, and confirms ownership by Playboy Enterprises, Inc., of all right, title and interest (except physical possession), including all rights of copyright, in and to the Work.

 Finally, between March 1981 and May 1984, when approximately 94 checks were issued by

Playboy for Nagel's contributions, the legend-endorsement on the back [hereinafter "Legend C"] read:

 Any alteration of this legend agreement voids this check. IT CONTAINS THE ENTIRE UNDERSTANDING OF THE PARTIES AND MAY NOT BE CHANGED EXCEPT BY A WRITING SIGNED BY BOTH PARTIES. BY ENDORSEMENT, PAYEE: acknowledges payment in full for the services rendered on a work-made-for-hire basis in connection with the Work named on the face of this check, and confirms ownership by Playboy Enterprises, Inc. of all right, title, and interest (except physical possession), including all right of copyright, in and to the Work.

2. For the period up to December 1977, some checks were also endorsed by Joel Harlib, Nagel's artist representative. Harlib also did business under the names Harlib & Assoc. and The Art Factory. PTM Stip.F. ¶ 38.

 Twice in 1981, the checks were endorsed by both Nagel and Dumas. *Id.* at ¶ 46.

pearing in *Playboy.*[3] In 1977, Nagel and Mirage Editions, Inc. ("Mirage") entered into an agreement providing for the publication and marketing of limited editions of reproductions of certain Nagel paintings. Between 1984 and 1990, the Nagel fine art reproductions and posters published and sold by Mirage generated $21 million in sales revenues; $2.5 million in sales revenues were generated in 1991 and 1992. *Id.* at ¶¶ 29–30.

In 1989, Dumas and JDI entered into agreements with third parties granting those parties the right to reproduce certain Nagel artworks of which the plaintiffs now claim to be the copyright owners. Plaintiffs brought an action claiming copyright infringement by Dumas and JDI in the United States District Court for the Northern District of Illinois. That action was settled when the parties entered into an agreement which they refer to as the Nagel Studio Partnership Agreement ("NSPA"), effective January 1, 1990. Conflicting claims of ownership were to be put aside for the term of the partnership and the litigation was terminated with prejudice with regard to the claims of infringement. *Id.* at ¶¶ 62–63. The NSPA provided each partner with a specified percentage interest in the income of the partnership from the exploitation of all of Nagel's work. However, the partnership was short-lived and was mutually terminated effective June 1, 1991. *Id.* at ¶¶ 64–65.

Playboy brought suit seeking a declaratory judgment in this court in September 1991. In June 1992, Playboy began marketing a collection of five silk screen reproductions and five offset productions of artwork created by Nagel under the name "The Playboy Collection by Patrick Nagel" (the "Collection"). *Id.* at ¶ 10. The silk screens range in retail price between $95 and $175 per work; the offsets are all priced at $30. *Id.* at ¶ 71. The works represented in the Collection were all originally created for inclusion in *Playboy* and all were created after 1978. Neither defendant gave authorization or consent for use of the works in the Collection. In October 1992, defendants filed an amend-

ed counterclaim for copyright infringement of the Nagel artworks reproduced in the Collection. Plaintiffs have conceded that if Dumas or JDI owns the rights in the 10 works comprising the Collection, and if Nagel did not grant Playboy the right to publish such reproductions, then plaintiffs' conduct constitutes infringement of defendants' copyrights. *Id.* at ¶ 74.

## DISCUSSION

Plaintiff asserts that the copyrights in question were transferred to Playboy, or, in the alternative, that the works were "works made for hire", thereby giving Playboy the copyrights outright. The analysis of these claims varies depending on whether the works in question were created or allegedly transferred subsequent to January 1, 1978, the date upon which the Copyright Act of 1976 ("1976 Act") took effect. All works created or transferred prior to that date are governed by the Copyright Act of 1909 ("1909 Act"). Because the works in question were created between 1974 and 1984, the court must review both theories of ownership under both Acts.

## I. TRANSFER

### A. Transfer under the 1909 Act

■ The 1909 Act did not protect unpublished works, but left that protection to the common law of the states. 17 U.S.C. § 2 (1976) (repealed). Thus for works created prior to 1978, there exist separate schemes protecting "statutory rights" and "common law rights." In general, transfer of the common law copyright could be oral or inferred from conduct. *Jerry Vogel Music Co. v. Warner Bros., Inc.,* 535 F.Supp. 172, 175 (S.D.N.Y.1982). Here, the checks with Legend A certainly purport to transfer rights. What has been litigated are what rights were transferred.

The issue of transfer is clouded by the doctrine of "indivisibility" which permeated pre–1978 copyright law. Indivisibility of

---

**3.** Nagel occasionally created and delivered works to Playboy that were substantially similar to contemporaneously prepared works that were not delivered. In these instances, he did not attach a

copyright notice to the works delivered to Playboy, but did attach a copyright notice in his name on the versions he did not deliver. PTM Stip.F. ¶ 69.

rights meant that no one right associated with a protected work could be assigned without assigning the other rights. *Goldwyn Pictures Corp. v. Howells Sales Co., Inc.*, 282 F. 9, 11 (2d Cir.1922). "A transfer of anything less than a totality of a work [was] a license and not an assignment." *International Film Exchange, Ltd. v. Corinth Films, Inc.*, 621 F.Supp. 631 (S.D.N.Y.1985). This distinction became crucial because of the requirement of the 1909 Act that statutory copyright protection was secured only upon publication with notice. 17 U.S.C. § 9 (1909), *amended as* § 10 (1947) (repealed 1976).[4] Without such notice, the work generally went into the public domain. The rationale for this rule was to limit multiple infringement actions. *New Fiction Pub. Co. v. Star Co.*, 220 F. 994 (S.D.N.Y.1915).

The doctrine of indivisibility was severely limited in this circuit by the decision in *Goodis v. United Artists Television, Inc.*, 425 F.2d 397 (2d Cir.1970). In that case, the court reversed the district court which had granted summary judgment upon the ground that the work at issue had fallen into the public domain when first publication with notice came after the author had sold the motion picture rights to a third party. The circuit court first described the distinction between "applying the indivisibility doctrine to cases where the issue is standing to sue for infringement and cases where the issue is protection of the author's interest." *Id.* at 401. The circuit court then found that a partial assignment was a sufficient means of obtaining copyright and providing adequate notice to the public under the 1909 Act. *Id.* at 403.

The present case must be examined against this background. Playboy asserts that its course of conduct with Nagel, the check endorsements, and the fact that *Playboy* kept possession of the original works until April 1977, make clear that a full transfer of rights took place.[5] Plaintiff relies heavily on *Geisel v. Poynter Products, Inc.*, 295 F.Supp. 331 (S.D.N.Y.1968). In that case, an author sought to prevent the creation and distribution of a doll based on cartoons he had sold to a magazine in 1932 as a freelance contribution. The agreement to prepare the cartoons was oral and was memorialized by checks of $300 per cartoon with an endorsement agreement on the back of each. Plaintiff there argued that the terms "all rights" and "complete rights" were never mentioned during negotiations and that those terms had limited meanings within the magazine industry applying only to one-time rights. After taking and reviewing extensive testimony on the custom and practice

---

4. Professor Nimmer provides an apt example of the difficulty raised by indivisibility in the context of contributions to collective works:

 Perhaps the most serious consequence of the doctrine of indivisibility occurred by reason of the rule that statutory copyright in a theretofore unregistered work was obtained by publication bearing a copyright notice in the name of the copyright owner. The problem thereby raised was felt most acutely and can best be illustrated in the field of magazine rights. If an author of an unpublished (and unregistered) manuscript granted to a magazine publisher the right to reproduce the work in magazine form, but reserved all other rights ... then ... the publisher would be merely a licensee, and not the proprietor of the work. Therefore, if, as was and is usually the case, the magazine carried a notice only in the name of the magazine publisher without a separate notice in the name of the contributing author, applying the doctrine of indivisibility the result was that the author's work was published without a valid notice in the name of the work's "proprietor" and it was consequently injected into the public domain.

*Nimmer on Copyright*, § 10.01[C][2], pp. 10–13–14.

5. Playboy also strenuously argues that a stipulated fact disposes of the matter. The parties have agreed:

 It has been the regular and consistent policy and practice of Playboy at all times relevant in this action to seek to acquire from freelance writers, artists and photographers who contribute to *Playboy* magazine all rights, including all copyrights, in their contributions to *Playboy* magazine and to seek to enter into agreements and relationships under which their contributions are considered to be works made for hire under the U.S. copyright laws.

PTM Stip.F. ¶ 23. The court believes the crucial language of this statement is that Playboy *sought to acquire* the rights listed, not that they did acquire the rights under the law or that they communicated their intentions to the artists with whom they were negotiating. Indeed, the latter two issues are factual determinations that are at the center of this case.

of the magazine industry in the 1930's, the court found: that agreements for sale of works to magazines were customarily oral and not written, *id.* at 336; that plaintiff had failed to prove that the terms "all rights" and "complete rights" had any meaning in the industry beyond their literal meaning, *id.* at 341; and that the scope of rights purchased by a magazine was customarily set forth in a legend on the check sent to the author or the author's agent, *id.* at 343.

Although there are appreciable parallels to the present case, this court will not follow the conclusions of *Geisel.* First, that case is grounded on facts determined by evidence and witnesses not before this court. Second, the court in *Geisel* explicitly limited testimony regarding industry custom to the period of 1928 to 1935. *Id.* at 341 n. 6. It accordingly limited all of its factual rulings to the customs in 1932. *Id. passim.*[6] Finally, the court had to contend with the doctrine of indivisibility before the *Goodis* decision. The court in *Geisel* relied on the district court decision in *Goodis*[7] to conclude that if all rights in the cartoons had not been assigned to the defendant, then the works had fallen into the public domain. Thus, the court analyzed the plaintiff's claim as if the copyright had been assigned to the publisher, but held in trust for the equitable owner, *i.e.*, the author. *Id.* at 337 (relying on *Bisel v. Ladner*, 1 F.2d 436 (3rd Cir.1924) (question of true ownership of copyright held in trust is one of fact)); *Jerry Vogel Music Co.*, 535

F.Supp. at 174–75 (author's widow had right to authorize a derivative work as a result of a trust despite the fact that publisher did not transfer the copyright until nine years later). The court in *Geisel* was not at liberty to contemplate the scenario where the author had transferred only limited publication rights, which is exactly the argument that Dumas makes here.

Turning to examine industry practice, the court looks primarily to the expert testimony offered at trial. Plaintiffs called Victor Kovner, an attorney who has an established practice representing the publishing industry, including the magazine industry. He served as Corporation Counsel for the City of New York during 1990 and 1991. In addition, he has served on the Legal Affairs Committee of the Magazine Publishers Association, on the advisory board of the Media Law Reporter, and the Lawyers Committee of the Association of American Publishers. The court gives his testimony weight, but notes that much of Kovner's work in the publishing field has dealt with topics outside of the copyright realm, with his specialty appearing to be privacy. Even when working on copyright issues, he has focused more on fair use questions and misappropriation than on transfers and work for hire issues. Furthermore, he has limited experience in negotiating with creators, artist representatives, and agents. Tr. 374–77.

---

**6.** While referring to the custom of memorializing oral agreements between authors and magazine publishers in a truncated form on a check legend, the court in *Geisel* did note that there was "evidence that the same practice continues today." *Id.* at 343 n. 10. In its papers, Playboy argues that this footnote along with the testimony of the expert witnesses in this case indicates that the *Geisel* conclusion about the validity of check endorsements as a custom of the magazine industry (and other *Geisel* court conclusions) remained in effect for the entire period before January 1, 1978. As is discussed below, both experts in this case as well as a few of the experts in *Geisel* indicated that check legends were used to memorialize pre-existing oral agreements; the problem in this case is discerning the terms of the oral agreements here. *See* Tr. 169 (no written agreement existed between Playboy and Nagel).

The relevance of the *Geisel* factual conclusions are also debatable in light of subsequent cases

dealing with magazine industry customs after 1932. In *Abend v. MCA, Inc.*, 863 F.2d 1465 (9th Cir.1988), *aff'd on other grounds sub. nom. Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990), an author had made a conveyance of his publication rights in a short story. The magazine subsequently reassigned any rights it had in the story except the right of magazine publication to the author. The circuit court concluded, "the evidence showed that the custom and practice of the time was for authors to convey to publishers only the right to publish the authors' stories in magazines in North America. All other rights were generally retained by the author.... [T]his practice was standard...." *Id.* at 1469.

**7.** *Goodis v. United Artists Television, Inc.*, 278 F.Supp. 122, 125 (S.D.N.Y.1968), *rev'd* 425 F.2d 397 (2d Cir.1970).

Defendants presented the testimony on E. Gabriel Perle. Perle has had a distinguished career in the law of copyright, particularly with regard to the field of magazine publishing. Between 1956 and 1985 he worked for Time Inc. serving as Assistant General Attorney and ultimately becoming Corporate Vice President–Law, where he oversaw the publishing and business ends of Time Inc. publications. In 1986, he returned to private practice where he continues to practice publishing copyright and communications law. He testified before Congressional committees on behalf of magazine publishers during the drafting of the 1976 Act. He has twice been chair of the copyright and trademark section of the American Bar Association, has lectured extensively, was appointed by President Gerald Ford to be a commissioner of the National Commission On New Technological Uses of Copyrighted Works, and has co-authored a Publishing Law Handbook. He has also drafted hundreds of contracts between magazines and creators, artist representatives, and agents. Tr. 511. The court finds that Perle is eminently qualified to testify in the area of magazine copyright and gives his testimony great weight.

Perle testified that the custom in the consumer magazine industry (mass circulation magazines such as *Time* and *Playboy*) between 1974 and 1984 was to acquire limited rights in contributions from its freelance contributors, often referred to as "one-time" rights. These rights included the privilege of reproducing and distributing the contribution as part of the collective work, any revision of the collective work, and any later work in the same series. Tr. 552–54, 558. These rights were codified as the rights available to publishers of collected works under 17 U.S.C. § 201(c). When a magazine sought to acquire more than one-time rights, the author and the publisher would negotiate and expressly agree to the terms of the transfer; without such an agreement, the magazine obtained only limited rights. Tr. 552–54, 558.[8]

Testimony from both sides indicates that check endorsements were frequently used within the industry to verify the terms of the pre-existing agreements. Tr. 415, 537. The use of the check endorsement alone, however, was not well regarded within the industry. Perle testified that the use of a check endorsement without a pre-existing written agreement, or certainly without an oral agreement, were "outrageous subterfuges." Tr. 544. Kovner acknowledged that he knew of no "reputable publisher who should use a legend agreement unless to confirm a prior express oral agreement as to the terms. Use of it in the first instance without any prior understanding is inappropriate at the bare minimum." Tr. 399. He also could identify no magazine that would attempt to acquire rights by a check endorsement without a prior oral agreement.

Perle testified that before January 1, 1978, industry custom was to hold the freelance contributor's copyright in trust, and reassign the copyright either out of due course or on request. Tr. 730–31. Kovner agreed that this was a common practice, although he believed that some magazines did not follow it. Tr. 397. However, he was unable to identify any particular publication that did not follow the custom.

In light of this testimony, Playboy relies on one other case to establish custom. *Franklin Mint Corp. v. Nat'l Wildlife Art Exchange, Inc.*, 195 U.S.P.Q. 31 (E.D.Pa.1977), aff'd 575 F.2d 62 (3d Cir.), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978), in relevant part, concerned a check for $1,500 issued with the legend "For Cardinal painting 20 X 24 including all rights—reproduc-

---

**8.** With regard to Section 201(c) the House Report of the Copyright Act of 1976, No. 94–1476, issued prior to implementation of the 1976 Act, indicated that sections 201(c) and 404 preserve the author's copyright in a work first appearing in a collective work even if the individual contribution does not bear a separate copyright mark:

This is coupled with a presumption that, unless there has been an express transfer of more, the owner of the collective work acquires "only the privilege of reproducing and distributing the contribution as a part of that particular collective work, any revision of that collective work, and any later collective work in the same series."

The basic presumption of section 201(c) *is fully consistent with present law and practice*, and represents a fair balancing of equities. House Report of the Copyright Act of 1976, No. 94–1476, at 122 (emphasis added).

tion, etc." Despite the artist's testimony that he intended to reserve copyrights in himself, the court concluded that all copyrights had passed to the purchaser. *Id.* at 36. However, the *Franklin* court relied on a presumption which is inapplicable here: "Except in California and New York, it is generally accepted that purchase of art includes all rights to copyright unless otherwise specified." *Id.* (citing *Nimmer on Copyright,* 541 (1976 ed.)). As is discussed below, the law that is applicable is the law of California. *Franklin Mint,* then, suggests that the presumption of transfer is contrary in this case to the position that Playboy holds.[9]

Based on the evidence before it, the court therefore concludes that between 1974 and 1978, the custom and practice in the magazine industry was to acquire one-time rights, unless explicitly stated otherwise. Thus any transfer would be thought to transfer the rights in an unpublished work such that the magazine would secure publication with notice in the work, and then transfer the rights in the work back to the author upon request. All that a check endorsement did was confirm a prior existing agreement, whether written or oral. In this case, Playboy introduced no credible evidence as to any existing prior agreement. Staebler testified that art directors at Playboy routinely informed the artists that they hired on a freelance basis that Playboy intended to acquire all copyrights in the works produced. Tr. 51. However, Staebler could confirm no such conversation with Nagel about a specific work; indeed, he did not have contact with Nagel until 1977. Tr. 199. Furthermore, Staebler could only testify to two conversations that he had with Nagel in which copyright was discussed. Aside from the hearsay problems with the testimony, both conversations were in general terms, not relating to a specific

work. Tr. 194–95. The first was in "the late 70s," presumably negating its relevance to works covered by the 1909 Act. The second discussion occurred over drinks when Nagel was melancholy and talking "jokingly." Tr. 211. In neither of these conversations did Nagel have legal representation, nor were actual negotiations undertaken. Tr. 207–08. On the basis of this thin evidence, the court cannot determine that copyright was ever explicitly discussed with Nagel prior to the creation of one of his pieces. Nor can the outline of any agreement be gleaned.[10]

Even if the court were to find the terms of the agreement simply on the basis of Legend A, there is credible evidence that the terms there are ambiguous. The Legend purports to transfer "all right, title, and interest" to the "items" that follow. The problem with this language is that under both the 1909 and 1976 Acts, there is a distinction between ownership of the copyrighted work and ownership of the material object in which the work is fixed. Thus, the reference to the "item" can be read to imply the material object. Perle found the Legend inherently ambiguous on this basis. Tr. 564–566. Kovner did not read the Legend to transfer ownership of the material object, but conceded that better draftsmanship would clear up possible confusion. Tr. 360–61, 399. The inference of confusion is made stronger in light of Playboy's policy until April of 1977 of retaining the original work. PTM Stip.F. ¶ 25. While the court recognizes that a transfer of some right of publication must have been intended by Nagel, on the record, it is simply unclear what the extent of the transfer was intended to be.

Finally, the exact parameters are unclear of the standard policy that Playboy claims to have communicated to all artists, including

9. The court is also unpersuaded by the general commentary on copyright by the *Franklin Mint* court, in that the court there was not confronting the more particularized use of a work in a collective work.

10. The amount paid for the works by Playboy also suggests that all rights including copyright were not being purchased. The parties have stipulated to the price scale for the works produced. *See supra* p. 300. As the court in *Geisel*

noted, "the price paid may be a circumstance probative of the scope of the rights purchased ..." *Geisel,* 295 F.Supp. at 339. Perle testified that during the applicable period, one-time use for spot illustrations in *Fortune* was $250–$300, which was on the low end of the scale. Tr. 559–60. Indeed, by the late 1970's Nagel's works were worth substantially more than what he was paid by *Playboy.* Tr. 239. However, Playboy did not change the pay scale, even as Nagel's fame grew. Tr. 237–38.

Nagel, who produced work for publication. Playboy did not have any internal document that explained what its standard policy was with regard to acquisition of artwork for publication, or how that standard policy was to be executed. Tr. 206. The court is left with no guide as to what that standard policy was, or how it may have changed over the years other than the self-interested testimony of Staebler.

Credible expert testimony as to industry practice, the prices paid for the works by Playboy, the lack of proof of any oral agreements, and Playboy's lack of evidence of any underlying oral negotiations weigh against the conclusion that all rights including copyright were intended to be transferred. Accordingly, the court finds that only one-time rights were transferred to Playboy in the Nagel paintings created prior to January 1, 1978.

### B. Applicability of California Statute

■ Defendants also argue that most of the alleged transfers occurring before 1978 are invalid because of specific protection afforded by state law. California law [11] requires:

> [W]henever a work of fine art is transferred, whether by sale or on commission or otherwise, by or on behalf of the artist who created it ... the right of reproduction thereof is reserved to such artist ... until it passes into the public domain by act or operation of law, unless that right is expressly transferred by a document in writing in which reference is made to the specific right of reproduction, signed by the owner of the rights conveyed or that person's duly authorized agent.

Cal.Civ.Code § 982(c) (Deering 1993). Nagel's works are "fine art" as used in the statute, for the term applies "to any work of visual art, including ... [a] painting .. [or a] work of graphic art...." Cal.Civ.Code § 982(d)(1). The statute provides further guidance that " 'Right of reproduction' at the

present state of commerce and technology shall be interpreted as including ... reproduction of works of fine art as prints suitable for framing; ... [and] reproductions in general books and magazines not devoted primarily to art ... when such reproductions ... are used for purposes similar to those of material for which the publishers customarily pay." Cal.Civ. Code § 982(d)(3). This law applies only to transfers on or after January 1, 1976. Cal.Civ.Code § 982(e).

In amending the existing statute, the California Legislature made a finding that technological advances had "created a whole new dimension in the field of fine arts. The traditional concept of a work of fine art as a unique one-of-a-kind creation has been replaced by important new property rights of substantial monetary value based on the reproduction of works of fine art." § 2, Cal. Stats.1975, ch. 952, p. 2128. The Legislature therefore declared that it was "the policy of the state to establish clear guideposts for all parties concerning legal ownership of the right of reproduction of works of fine art." *Id.*

Neither the court nor the parties have found any case law construing this statute. Nevertheless, the court finds the language of the statute unequivocal. Upon the transfer of the work itself, the concomitant transfer of reproduction rights must be express, in writing, with reference to the specific right of reproduction. Legend A, the mechanism by which the plaintiffs claim transfers took place, does not meet the requirements of the statute. The phrase "all right, title, and interest" does not specifically refer to reproduction rights. Indeed, as discussed above, it is unclear from the context whether that phrase indicates rights in the physical work or the rights to the underlying work.

Plaintiffs make three arguments to overcome the result of application of this statute. Perhaps the strongest is that the phrase "all right, title, and interest" includes reproduction rights. Plaintiffs rely on *Franklin Mint*

---

**11.** California law applies because Nagel was a citizen of California, living and working there during all times relevant to this litigation. All checks were paid in California. Playboy does substantial business in California. The court

therefore applies California law. Neither party has given any indication, after extensive discussions of California law, as to why it would not apply.

*Corp.* and on *Sargent v. American Greetings Corp.*, 588 F.Supp. 912 (N.D.Ohio 1984), for construction of similar legend agreement phrases transferring all rights including reproduction rights. But in the former case, the legend endorsement specifically included "all rights-reproduction." *Franklin Mint*, 195 U.S.P.Q. at 36. In the latter case, the check endorsement involved only "the exclusive right to publish," and thus, after distinguishing *Franklin Mint*, the district court denied a motion for summary judgment because the legend language along with contracts between the parties left a question of material fact as to the parties' intent concerning copyright ownership. *Sargent*, 588 F.Supp. at 923. *Geisel*'s interpretation of such language is also inapposite here because the California Legislature has decided on what constitutes "clear guideposts" to the rights of reproduction of works—namely, an express and specific reference to such rights in the written instrument of transfer.

Plaintiffs' second argument is that the parties have stipulated that after April 1977, Playboy no longer acquired any ownership rights in the works submitted to it, and thus there were no transfers of the works of fine art subject to the statute. The stipulated fact to which they refer states only that "Effective April 1, 1977, Playboy adopted a new policy whereby it returned the original renditions of such works received thereafter to the contributors thereof." PTM Stip.F. ¶ 26. There is no indication in the statement that Playboy intended specifically to give up alleged ownership. Indeed, Legends B and C, which supposedly reflect the change in policy, excepts the right of physical posses-

sion of the artwork, not the ownership of the artwork. However, possession is not ownership. Plaintiffs' position is also belied by the stamp on the back of the returned artwork that declares "PLAYBOY'S ARTWORK/REPRODUCTION/PROHIBITED WITHOUT/PLAYBOY'S PERMISSION." The implication of the possessive noun in the statement cannot be ignored.

Finally, plaintiffs make the strained argument that because Nagel obviously transferred "magazine rights" or "one-time rights" at a minimum, then those rights are "reproduction rights" which in turn means that the parties deemed their agreement in compliance with the statute. Therefore, argue the plaintiffs, the defendants are now estopped seventeen years later from asserting that the transfers were invalid. Aside from the tortured logic of this position, there is no evidence to support what the parties "deemed" in regard to the statute. The court therefore concludes that because Legend A fails to specify rights of reproduction that were to be transferred with the alleged transfer of ownership of the Nagel works of fine art, those transfers were invalid under § 982(c).

## C. Transfer under the 1976 Act

 The court now turns to the validity of the transfers under the 1976 Act. "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).[12]

---

12. Defendants make the argument that the California "equal dignities rule" bars most of the check endorsements from constituting valid transfers. That rule provides, "[A]n oral authorization is sufficient for any purpose, except that an authority to enter into a contract required by law to be in writing can only be given by an instrument in writing." Cal.Civ.Code § 2309 (Deering 1993). Dumas claims that because there are no such instruments between Nagel and his agents, any alleged transfer after January 1, 1978, other than one signed by Nagel, is invalid. The court rejects this argument because the explicit language of § 204(a) of the 1976 Act requires only that "an instrument of conveyance, or a note, or a memorandum of the transfer" be in writing. A valid written contract satisfies the writing requirement of § 204(a). *Cf. Frost Belt Int'l v. Cold Chillin' Records*, 758 F.Supp. 131, 138 (S.D.N.Y.1990). However, a contract transferring copyright is not "required by law" to be in writing so long as there is a sufficient writing memorializing the contract after its formation. *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982) (writing memorializing oral license did not need to be made at time when the license was initiated; requirement of statute is satisfied by later execution of a writing confirming the agreement); *see also Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154, 1162 (S.D.N.Y.1988) (contract to transfer copyright cannot be enforced without a writing).

■ Defendants assert that the writing requirement of § 204(a) is not met by the check legends for a variety of reasons. For those works governed by Legend A, between January 1, 1978 and approximately April 1979, as the court discussed above, the language is ambiguous. No mention is made of copyright. All right, title and interest are in the "item." Because ownership of copyright in a work is distinct from ownership of the material object, 17 U.S.C. § 202, there is no clear way to tell to what the parties intended by their agreement. Indeed, the writing is the only evidence of the agreement, as Playboy offered no evidence of any oral negotiation or understanding between it and Nagel. Without the understanding of the author and the transferee specifically committed to writing, the transfer cannot be valid.

Nor is the language of the legend dispositive. In *Davenport Quigley Expedition, Inc. v. Century Productions, Inc.*, 18 F.Supp. 974 (S.D.N.Y.1937), the court concluded that the plaintiff could not maintain a suit for infringement when he had purchased a film and copyright in it from a person who had been sold the film by a bill of sale where the author "bargained, sold granted and conveyed ... all my right title and interest in and to a certain negative of motion picture film dealing with animal study in Africa ...," and also one positive of the same negative film." The court was compelled to so hold because the language of the bill of sale did not by implication assign copyright, and the plaintiff had failed to prove a valid copyright in itself. *Id.* at 977. *See Cassway v. Chelsea Historic Properties*, 26 U.S.P.Q.2d 1791 (E.D.Pa.1993) (ownership of property does not entail ownership of copyright).

Plaintiffs cite *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir.1990) for the proposition that the writing required "doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Id.* at 557. Without passing on the wisdom of this view of section 204, the court believes that the view expressed in *Effects Associates,* that did not deal with any writing at all, is predicated on the fact that the terms of the pro forma statement are clear. Where they are not clear, there should be evidence of the oral agreement which the one-line written statement memorializes. Here, however, there is no parol evidence other than Playboy's assertions to help guide the court as to the meaning intended by the Legend A endorsements.

Plaintiffs also rely on *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.*, 690 F.Supp. 298 (S.D.N.Y.1988). In that decision, the court denied a motion by defendants for summary judgment on a copyright infringement claim. The court found that two writings "may well fulfill the statutory requirement" of section 204. *Id.* at 300. One writing was a letter that stated in full, "Please use this letter as a letter of authorization to transfer ownership of all screens holding at Craft for the following: Soptra Fabrics/Loomskill Inc./Couleur Inc./ to the account of Kenbrooke Fabrics Inc." The court held that if the author of the letter were found to be the "duly authorized agent" of the owner of the screens, then the letter would satisfy the statute. *Id.* at 301.[13] The court also concluded that even if section 204 had not been complied with, a third party infringer could not invoke the statutory requirement against a licensee, which the court thought might have been the case. However, after a bench trial, the court concluded that the above writing did not transfer copyright, but only ownership in the screens, despite the fact that there would be marginal value to the screens without exclusive use to repro-

---

Defendants also make the argument because California Civil Code § 982(c) requires a writing for transfer of reproduction rights when the art itself is transferred, § 2309 therefore applies to any transfer after January 1, 1976 (the date of effect for § 982(c)). The court rejects this argument on similar grounds, noting that the specific language of § 982(c) requires only a writing for a transfer and not a contract. *See infra* pp. 306–307. This conclusion is verified by a provision within the statute that provides, "[i]f the transfer is pursuant to a legacy or inheritance, the right of reproduction is transferred to the legatee or heir, unless it is expressly reserved by will or codicil." Cal.Civ.Code § 982(c). Such a provision further negates defendants' argument of a contractual requirement under § 982(c).

13. The parties have argued extensively about whether the majority of the checks were signed by one of Nagel's "duly authorized agents." However, given the courts disposition that no transfers occurred, the question of the authority of Nagel's agents need not be addressed.

duce the underlying patterns on the screens. The court based its decision in part on the fact that plaintiffs could offer no evidence that ownership of copyright, which was not mentioned in the letter, was mentioned in the negotiations which the letter memorialized. *Kenbrooke Fabrics Inc. v. Soho Fashions Inc.*, 13 U.S.P.Q.2d 1472, ·1474 (S.D.N.Y. 1989). Thus, if this court is to be guided at all by *Kenbrooke*, the decisions taken together suggest that unless there is evidence of an intention to transfer copyright, a writing merely reciting transfer of an object will not transfer the copyright.

Playboy also relies heavily on *Dean v. Burrows*, 732 F.Supp. 816 (E.D.Tenn.1989). There the plaintiff sought to buy the molds and the copyrights in a variety of pig sculptures owned by the defendant. The defendants were paid $500 for transferring the copyrights and the molds by a check with a notation on its face that the check was for "mold designs and molds." The court held that the check complied with section 204. In the next sentence, the court pointed out that the transfer occurred in March, 1984 (the month the check was issued), and that a written transfer agreement was prepared in the same month that was subsequently recorded in the Copyright Office. Although the court there was concerned primarily with whether a copyright notice was defective under 17 U.S.C. § 406(b), its comments on section 204 in light of the evidence of oral negotiations and a written agreement do not help Playboy. This court understands the court in *Dean* to suggest that the check endorsement was sufficient as a writing because its meaning could be determined, if not on its face, by the evidence of the agreement which it memorialized. As has been pointed out, there is no such evidence in this case.

The court also notes that there is no language of present transfer in Legend A. Staebler testified that there were no other oral or written agreements with Nagel obligating either party beyond a pending assignment. Tr. 169. Thus the question of when the transfer occurred adds to the ambiguity of Legend A. The language of the Legend acknowledges transfer; but it is unclear whether the transfer occurred with posses-sion of the material object, with the payment of the check, with the endorsement of the check, or at some other time. Defendants introduced other forms using check legends and assignment forms used by Playboy that indicated a point of transfer. Def. Exh. T, U, AJ. However, there is no indication why such language was not used here. Given the lack of evidence surrounding the agreements said to underlie checks bearing Legend A, the court therefore concludes that Legend A was insufficient, by itself, to transfer copyright ownership in any of the Nagel works.

Legends B and C present different problems. There is no mention in them of assignment, transfer, or license. Rather, the Legends explicitly refer to "work-made-for-hire." At other points in the litigation, plaintiffs have urged that the court be guided by the principle that in construing terms of an agreement, "words are to be given their ordinary meaning." Pl. Post–Tr. Mem. at 17 (quoting *Kemelhor v. Penthouse Intern., Ltd.*, 689 F.Supp. 205, 212 (S.D.N.Y.1988), *aff'd* 873 F.2d 1435 (2d Cir.1989); Pl. Post–Tr. Mem. at 22–23 (quoting *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990)). The court believes this principle to be applicable in the present case. Playboy, alone, selected the work made for hire language, and thus must succeed or fail on the basis of that draftsmanship. Where the party who drafted the language of an endorsement that provides the only evidence of any agreement explicitly chooses one mechanism of acquisition, there is no reason to supply that party with a secondary position in case the first fails. The policy underlying section 204 and all written agreements is that a writing "prevents misunderstanding by spelling out the terms of a deal in black and white, forces parties to clarify their thinking and consider problems that potentially could arise...." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.1990). This is not to say that language safeguarding copyright acquisition cannot take the form of both work made for hire and transfer. At trial, Perle credibly testified that it is common in the magazine industry for a publisher to obtain rights from a freelance contributor by an agreement with "two strings to the contrac-

tual bow." Tr. 570. In these agreements, the recitation is that the work be considered a work made for hire, but if the work is in fact not a work made for hire, then the author by his or her signature thereby transfers and assigns any right, title, and interest in the work, and any copyright therein, effective the date of the creation of the work. Def. Exh. CL. Playboy did not exercise this option. Legends B and C refer exclusively to work made for hire principles. There is no indication of an intention to transfer anything at all under Legends B and C. Accordingly, the court will judge the Nagel works created once Playboy began using Legends B and C only as to whether they can properly be considered works made for hire.[14]

## II. WORKS MADE FOR HIRE

In order to address the issue of commissioned works under the work made for hire doctrine, the relationship between Playboy and Nagel must first be understood. Staebler testified that while there were subjects which would not have been accepted by Playboy in the Nagel works, apparently no Nagel work was ever rejected outright. Tr. 241. Hugh Hefner, *Playboy*'s founder and editor-in-chief, has written that

At first, we asked [Nagel] to illustrate a particular letter to the 'Advisor' every month, but soon it was clear that trying to funnel such a large talent so narrowly was like telling Irwin Shaw or Ray Bradbury what to write about. We asked him simply to give us a painting a month. As it turned out, the painting he gave us invariably illuminated one, two, three or all of that month's 'Advisor' letters in a way no commissioned illustration ever had.

Def. Ex. BX, p 16. Similarly, at trial, Staebler testified that for the first three or four years of the relationship Nagel received guidance, but after that the "subject matter was the same every month. It was just a matter of how it was composed and so on." Tr. 241. No one at Playboy could testify which of the works were done free of specific instruction. Tr. 243.[15]

Staebler did testify that Hefner and he had helped Nagel to "change the basic look" of his stylized drawings which were "a natural extension of the Vargas girl." Tr. 167–68. But there was no indication of what form this help took or when the advice ceased to be given.[16] From copies of *Playboy* introduced at trial, it is clear that Nagel was accepting at least some specially commissioned work in December 1976. Pl. Exh. 1d, pp. 134–37 (4 page spread illustrating an article entitled "Are You Sexually Liberated Enough to Make It with More Than One Person or Species at the Same Time and If Not, Why Not?" by Barbara Nellis and James R. Peterson ("Nellis article")). However, the work depicted there is not of the same type or style for which Nagel became famous, Tr. 228–30, or that Playboy would later choose to reproduce in the Collection. Pl.Exh. 16; *compare* Pl. Exh. 1d *with* Def. Exh. BW. Indeed, the earliest publication in *Playboy* of a work reproduced by plaintiffs in the Collection was in August 1978, more than a year and half after the Nellis article. From this evidence, the court concludes that Nagel was given specific instructions for his early submissions to Playboy. *See* Pl. Exh. 1b, *Playboy*, April 1974, p. 26 (spot illustration of Lillian Hellman, Nagel's first piece for Playboy). Sometime after January 1977 but before August 1978, Nagel and Playboy fell into a course of conduct whereby Nagel would produce a few works for Playboy expecting

14. Because of this disposition of transfers under the 1976 Act, the court declines to reach the question of whether California Civil Code § 982(c) applies to transfers after January 1, 1978, or whether that statute is pre-empted by 17 U.S.C. § 301.

15. Plaintiffs produced 13 assignment slips that were purportedly sent to Nagel beginning in 1983. Staebler testified that this was due to a magazine wide change in policy. Tr. 251–52. Nagel, however, never signed any of the slips,

thus rendering them of little use in establishing a work made for hire relationship under section 101(2) of the 1976 Act.

16. Staebler did testify that Playboy sometimes asked for changes in the work, Tr. 171–72, but specified no instance when this occurred. Staebler also gave deposition testimony about changing the "heaviness" of the line that Nagel used in his work, but that too was unrelated to a specific work. Tr. 621. Accordingly, the court does not give this testimony weight.

them to be published; Playboy, in turn, expected to publish a few of Nagel's works. As Staebler testified, "at some point we told [Nagel] we are going to be running this and it looks like this is going to be a regular feature, but there was no commitment on either part that it couldn't be stopped at any point." Tr. 169. Neither party appears to have tested the boundaries of the other.

### A. Work for Hire under the 1909 Act

The 1909 Act allowed that the definition of "'author' shall include an employer in the case of works made for hire." 17 U.S.C. § 26 (1976) (repealed). Because neither "employer" nor "works made for hire" were defined by the Act, the construction of the terms was left to the courts. *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 744, 109 S.Ct. 2166, 2175, 104 L.Ed.2d 811 (1988) ("*CCNV*"). With regard to commissioned works, it was generally presumed "that the patron desires to control the publication of copies and that the artist consents that he may, unless by terms of the contract, express or implicit, the artist has reserved the copyright to himself." *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28 (2d Cir. 1939), *cert. denied*, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940). Not until 1966, after the work for hire provisions of the 1976 Act had been negotiated and drafted substantially into the form in which they would be codified, did "a federal court for the first time appl[y] the work for hire doctrine to commissioned works." *CCNV*, 490 U.S. at 749, 109 S.Ct. at 2177 (citing *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567–68 (2d Cir.1966)). As developed in the Second Circuit, the "doctrine is applicable only when the employee's work is produced at the instance and expense of the employer, [*Brattleboro Publishing Co.*

369 F.2d at 567], or, in other words, when the '"motivating factor in producing the work was the employer who induced the creation ..."'." *Siegel v. National Periodical Publications, Inc.*, 508 F.2d 909, 914 (2d Cir.1974) (citations omitted).

The presumption of the copyright ownership residing in the party at whose instance and expense the work had been created can be rebutted by a preponderance of evidence of an agreement to the contrary. *Roth v. Pritikin*, 710 F.2d 934, 937 n. 3 (2d Cir.), *cert. denied*, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983). One circuit has held that the intent of the parties is "the decisive factor." *Real Estate Data, Inc. v. Sidwell Co.*, 809 F.2d 366, 371 (7th Cir.1987). Other courts have allowed evidence of "prevailing custom and usage" to determine whether the parties intended to contract contrary to presumption under the work made for hire doctrine. *May v. Morganelli–Heumann & Assoc.*, 618 F.2d 1363, 1369 (9th Cir.1980).[17]

The court begins by applying the instance and expense test. There is no doubt that Nagel was directed to create at least some of the works that appeared in *Playboy* prior to January 1, 1978. The portrait of Lillian Hellman, the art accompanying the Nellis article, and illustrations for features on travelers' aids (*Playboy*, March 1975) must have been "motivated" or "induced" by Playboy. There is no indication though of any expense incurred in this process that was borne by plaintiffs. As is indicated above, Nagel provided his own tools, worked his own hours, hired his own assistants, and paid his own taxes and benefits. There is no indication that there was any real risk involved for Playboy. Staebler testified that it was general practice to pay artists whose

---

**17.** In allowing such evidence, the court in *May* cited *Avedon v. Exstein*, 141 F.Supp. 278 (S.D.N.Y.1956), as contrary. In *Avedon*, the court concluded that a photographer who had delivered a photo to an advertising agency that had commissioned him could not offer evidence of contrary custom or usage "to oppose or alter a general principle or rule of law." *Id.* at 280 (quoting with approval *Colten v. Jacques Marchais, Inc.*, 61 N.Y.S.2d 269, 271 (N.Y.Mun.Ct. 1946)). However, the court was dealing explicit-

ly with the common law as to commissioned works, not to the work made for hire doctrine of the 1909 Act as applied to commissioned works. Furthermore, as *Brattleboro* and its progeny make clear, the applicable rule of law is that satisfaction of the instance and expense test raises a presumption, not that it guarantees the rights of authorship under the 1909 Act. This court thus concludes that *Avedon* is no bar to considering evidence of custom and usage.

work had been rejected a "turn down" fee of one quarter the price that would have been paid if the piece had been accepted. Tr. 58. However, all of Nagel's work appears to have been accepted. *See* Tr. 169–72. Furthermore, there is no evidence that Nagel knew of this turn down fee. Thus, while it is evident that many of the Nagel works in the pre–1978 period were created at the instance of Playboy, the expense of preparation apparently fell to Nagel.

Even if the instance and expense test were fully met, the court believes other evidence weighs against finding a work made for hire relationship. The court begins by examining the only records of any agreements between Nagel and Playboy concerning works prepared prior to January 1, 1978, *i.e.,* the checks with the Legend A endorsement. The language of the Legend is clear that the agreement is intended to be an "assignment." In other words, the parties used the language of transfer. All parties agree that Playboy sought to obtain all rights of reproduction and ownership in the artwork produced by Nagel. PTM Stip.F. ¶ 23. But Playboy chose the mechanism by which such an acquisition was to be accomplished; they chose the language of the check endorsement; they chose the language of assignment and included no indication of a work made for hire relationship.[18] An assignment would not make sense if the parties presumed that Playboy would be the author of the work for statutory purposes. Rather, the language to be expected would verify the work relationship. As to the evidence of custom in the industry, as indicated above, the court finds that during 1974 through January 1, 1978, the custom in the magazine industry was that absent explicit language to the contrary, a contributor transferred only one time reproduction rights in the work sold for publication. Thus, even if the instance and expense test were met in this case, the custom of the industry and the intent of the parties manifested in Legend A, taken together, show that the parties here had an agreement that was not intended to bring the Nagel works under the scope of the made for hire doctrine. Accordingly, plaintiffs' claims of pres-

ent copyright ownership in the Nagel works created prior to 1978 are found to be without merit.

### B. Work for Hire under the 1976 Act

The 1976 Copyright Act states that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. 201(a). The author is often the creator of the protectable work, "that is, the person who translates an idea into a fixed tangible expression entitled to Copyright protection." *CCNV,* 490 U.S. at 737, 109 S.Ct. at 2171 (citing 17 U.S.C. § 102). As discussed above, copyright in each contribution to a collective work vests initially in the author of the individual contribution, and is considered separate and distinct from the copyright of the collective work. 17 U.S.C. § 201(c). However, the 1976 Act provides an exception to this rule:

> In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201(b).

Under the 1976 Act, a "work made for hire" is either "(1) a work prepared by an employee within the scope of his or her employment" or "(2) a work specially ordered or commissioned for use as a contribution to a collective work ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The parties have agreed that Nagel was at no time an "employee" of Playboy within the meaning of "work made for hire" as defined in § 101. PTM Stip. F. ¶ 48. The question, then, is whether the Nagel productions that appeared in *Playboy* fall within the second definition (hereinafter § 101(2)). Because the works were used in *Playboy,* a collective work within the meaning of the 1976 Act, two inquiries remain: whether the works were "specially ordered or commissioned" and whether the

---

**18.** This language does not implicate the two strings of the bow approach described by both

experts at trial, because one string is completely absent.

legend endorsements on the Playboy checks constituted a sufficient writing to create a work made for hire relationship.

### 1. Specially Ordered or Commissioned Work

■ The legal parameters of what constitutes "specially ordered or commissioned" works under the current law are vague. Neither term is defined by the 1976 Act. The Supreme Court has noted in passing that "a party who hires a 'specially ordered or commissioned' work by definition has a right to specify the characteristics of the product desired ..." *CCNV*, 490 U.S. at 741, 109 S.Ct. at 2173.[19] The Court also has indicated that "[t]he unifying feature of [commissioned works eligible for work made for hire status under the Act] is that they are usually prepared at the instance, direction, and risk of a publisher or producer." *Id.* at 741, 109 S.Ct. at 2173 (citing Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., Copyright Law Revision, pt. 6, p. 66–67 (H.R. Judiciary Comm.Print 1965)). Surprisingly, few other courts have considered the question of whether a work has been commissioned, particularly under the 1976 Act. Most cases appear to examine the surrounding circumstances. *See Nimmer on Copyright*, § 5.03[B][2][d], 5–43 (hereinafter "*Nimmer*"). The seminal statement of the central consideration in the examination is that the " 'motivating factor in producing the work was the employer who induced the creation....' " *Siegel*, 508 F.2d at 914 (2d

Cir.1974) (quoting *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir.).[20]

■ The issue identified by the Supreme Court of which party was specifying the characteristics of the work weighs in favor of Nagel, if it has any weight at all. Playboy apparently was no longer controlling characteristics of the works by mid–1978. Furthermore, there is no evidence that the works were created at the instance, expense, or risk of Playboy. The instance here cannot be determined. The relationship was a continuing one, and plaintiffs have offered no evidence of any specific orders after 1976. Although they argue that the course of conduct of the parties should be sufficient, determinations of works made for hire must be established on a work-by-work basis. *Weissmann v. Freeman*, 868 F.2d 1313, 1317 (2d Cir.), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); *see* 17 U.S.C. § 101 (each version of a "created" work constitutes a separate work). Nagel was the one who bore the risk because there was no commitment on the part of Playboy to purchase the works, although by 1978 a market for his works was already developing. And there is no dispute that Nagel was the one who bore the expense of the creation. In the totality of the surrounding circumstances, the court cannot say that any work created by Nagel after January 1, 1978, was "specially ordered or commissioned" within the meaning of work made for hire as defined in 17 U.S.C. § 101(2). Thus, plaintiffs can claim no ownership in the Nagel works under § 201(b). Rather, for any Nagel work purchased for use in *Playboy*, plaintiffs are presumed "to have acquired only the privilege of reproduc-

**19.** This court interprets the language of the Supreme Court to mean that the exercise of the right of artistic control by the party for whom the work is being prepared can be highly indicative of a commissioned relationship. However, this court believes that the waiver or absence of exercise of that right need not negate the possibility of a commission relationship. *See Nimmer*, § 5.03[B][2][d], 5–44, n. 171. *Cf. CCNV*, 490 U.S. at 742, 109 S.Ct. at 2174 (in construing § 101, "there is no statutory support for an additional dichotomy between commissioned works that are actually controlled and supervised by the hiring party and those that are not."). *But see Roy Export Co. Establishment v. Columbia Broadcast Sys., Inc.*, 503 F.Supp. 1137, 1149–50

(S.D.N.Y.1980), *aff'd* 672 F.2d 1095, 1101, n. 12 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (artistic control of the creators was one factor to be considered in deciding whether a work had been commissioned). In either case, artistic control or the lack thereof is but one factor to be considered in evaluating the relationship between the parties.

**20.** "Employer" in the *Siegel* case must be understood in the context of the 1909 Act where independent contractors could be "employees" within the meaning of the work made for hire doctrine. A more accurate term under the present regime might be "hiring party." *See CCNV*, 490 U.S. at 738 n. 6, 109 S.Ct. at 2172 n. 6.

ing and distributing the contribution as part of that collective work, any revision of that collective work, and any collective work in the same series." 17 U.S.C. § 201(c).[21]

### 2. Retroactive Writings

■ The court believes that the plaintiffs' claim of ownership on a work made for hire basis under the 1976 Act is flawed for a second, independent reason. Assuming, without deciding, that the language of the legends was sufficient to create a work made for hire relationship, and assuming *arguendo* that plaintiffs had established that the works were "specially ordered or commissioned," there remains a problem of timing. Both parties have raised the question of the validity of a retroactive writing for works made for hire. The language of section 101(2) on its face is of little help. Although the condition that must be expressed in the writing is that the work "shall be considered" a work made for hire, there is no indication as to whether the work is preexisting. In other words, the statute can be read to mean either that (1) a work in existence (or in progress) shall be considered a work for hire from the time of the writing, or that (2) at the time of executing the writing, the work had yet to be created or fixed in a medium, and thus would be a work made for hire upon creation and fixation.

This court believes that the structure of the 1976 Act favors the latter interpretation. To begin with, the 1976 Act protects works in progress. *Dumas v. Gommerman*, 865 F.2d 1093, 1097 (9th Cir.1989) (citing 17 U.S.C. § 101, definitions of "created" and "fixed"). As discussed above, section 204(a) requires a written instrument for copyright transfer. Execution of such a writing is necessary because "[o]wnership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. "Section 201(b) is therefore necessary to establish the employer as initial

owner of the copyright in works made for hire. Without this provision, copyright would vest in employees at the moment of fixation, and a written instrument would be required to transfer copyright to the employer." *Dumas*, 865 F.2d at 1097–98.[22] These provisions suggest that work made for hire agreements must precede the creation of the work; otherwise, such agreements are little more than transfers which are already covered under section 204. Furthermore, section 201(b) would not have applicability to copyrights, but only to the additional legal consequences that arise from a work for hire arrangement such as the availability of artists' rights or the duration of copyright. *Nimmer*, § 5.03[A], 5–10. This court does not believe that Congress intended such redundancy in the statutory scheme. *Cf. Connecticut National Bank v. German* — U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (generally courts should disfavor interpretations of statutes that render language superfluous); *see also id.* at ——, 112 S.Ct. at 1151 (O'Connor, J., concurring) (Court interprets statutes to avoid redundancy). Nor does the legislative history suggest that such a redundancy existed or was intended. Barbara Ringer of the U.S. Copyright Office testified before Congress that her understanding of the legislation meant that a work prepared on special order or commission "would not be considered a 'work made for hire' if the contract were signed later on—after the work was written, for example," H.R.Rep. no. 51–374, 89th Cong., 1st Sess., Part 5, *1964 Revision Bill with Discussion and Comments*, at 145 (1965).

■ The only case addressing the question of the timing of for-hire agreements under the 1976 Act of which the parties or the court is aware is *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992). In that case the court held that the writing required by section 101(2) "must precede the creation of the property in order to

---

**21.** Because the court has concluded that the Nagel works were not specially commissioned after January 1, 1978, it does not reach the question of whether the legends on the checks would be sufficient to constitute a written instrument under § 101(2) of the 1976 Act.

**22.** All works made for hire are governed by § 201(b), thereby encompassing both definitions in § 101.

serve its purpose of identifying the (noncreator) owner unequivocally." *Id.* at 413. Although no authority was cited directly for this proposition,[23] Judge Posner grounded the statement on the principle that in addition to having a primary purpose of a statute of frauds, section 101(2) has a secondary purpose "to make ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable." *Id.* at 412 (citing *CCNV*, 490 U.S. at 750, 109 S.Ct. at 2178).

This logic strikes the court as sound. This court therefore holds on the basis of the statutory scheme, the legislative history, and the reasoning of Judge Posner, that a writing is required prior to the creation of a work in order for the work to be considered a work made for hire within the meaning of 17 U.S.C. § 101(2).[24] Accordingly, this court finds that none of the check legends in this case were a sufficient writing within the meaning of the 1976 Act to make the Nagel pieces work made for hire for Playboy, because all of the writings came after the creation of the works.

## III. LANHAM ACT CLAIMS

Defendants have brought a counterclaim under Section 43(a) of the Lanham Act claiming that plaintiffs violated that Act by titling the posters as "Images from The Playboy Collection by Patrick Nagel" and promoting them as the "Nagel Collection." Defendants argue that the attribution of the Collection to Nagel is false on its face. They argue that because they did not authorize or approve of the selection or quality of the reproductions, defendants have shown a Lanham Act violation. Relying on the Second Circuit's decision in *Gilliam v. American Broadcast Cos.*, 538 F.2d 14 (2d Cir.1976), defendants further argue that unauthorized alterations to a work of art are actionable under Section 43(a).

Section 43(a) of the Lanham Act provides that:

(1) Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as

---

**23.** Plaintiffs make much of the fact that the issue of timing was not briefed for the court in *Schiller* and sought a representation to that effect from defendants. Plaintiffs assert that this court is not bound by "unbriefed and unsupported dicta." (Pl.Post–Tr. Mem. at 36). Rather, plaintiffs argue, the policy of "predictability and certainty of copyright ownership" is best served by giving effect to the demonstrated intent of the parties. Nimmer provides some support for this position. Nimmer first praises the goal, protected by *Schiller*, of certainty and the protection of third parties who are later surprised by after the fact declarations of work made for hire status. However, this praise is tempered by criticism that the bright line rule of *Schiller* "could frustrate the intent of the parties, and cloud rather than serve the goal of certainty...." *Nimmer*, § 5.03[B][2](b), 5–35. Without addressing the ambiguity in the parties' "intent" in this case, the court notes the intent of the parties cannot supersede a requirement mandated by a statutory scheme.

**24.** There was convincing testimony offered at trial that under certain circumstances, the exigencies of a situation would prevent the execution of a writing prior to the creation of the work. Perle offered the example of a photographer contacting a magazine immediately prior to the eruption of Mt. Helena (referring, presumably, to Mt. St. Helens), offering to record the catastrophe on film. Tr. 541–43, 580–83. Under such circumstances, even in the age of the facsimile and overnight mail, a writing prior to creation would clearly be impossible. In such a situation Perle advocated the use of a detailed agreement reciting both the terms of the agreement and the reasons that prohibited the writing prior to the work's creation. Tr. 543; Pl.Exh. 46, pp. 15–23. Without deciding, this court notes that such an emergency exception to the writing requirement may be tenable. Allowing the intent of the parties to govern in such a situation would not undermine either purpose of § 101(2), nor would it contradict the rule that intent cannot supersede statutory requirements. *See supra*, n. 23. Rather, it would create a limited and narrow exception that would allow a complex statutory scheme to operate logically, despite the vagaries of the "real world." Even if a court or Congress were to decide that no such exception should exist, a bargained for agreement could transfer the rights under section 204(a), although other benefits of section 201(b) would not apply.

to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125(a).

"The use of a person's name in a manner which misidentifies that person as the author or creator of a particular work is encompassed by the prohibition in Section 43(a) of the Lanham Act." *King v. Allied Vision, Ltd.*, 807 F.Supp. 300, 305 (S.D.N.Y.), *aff'd, in relevant part sub. nom. King v. Innovation Books*, 976 F.2d 824, 829 (2d Cir.1992). Furthermore, "[i]t is sufficient to violate the Act that a representation of a product, though technically true, creates a false impression of product's origin. *See Rich v. RCA Corp.*, 390 F.Supp. 530 (S.D.N.Y.1975) (recent picture of plaintiff on cover of album containing songs recorded in distant past held to be false representation that songs were new) . . . ." *Gilliam*, 538 F.2d at 24. In order to establish their Lanham Act claim, the defendants rely on these principles in conjunction with the admission by Playboy that neither Nagel nor the defendants authorized or approved the selection or quality of the reproductions in the Collection. Tr. 671.

In the *King* decision, the Second Circuit concluded that where a well known writer had neither had been involved in nor had given approval to a screenplay and movie loosely derived from his short story, a possessory credit on the movie was misleading and likely to confuse consumers within the meaning of the Lanham Act. *King*, 976 F.2d at 829. Here, however, the court cannot say that the name of the Collection is false on its face. The terms "by Patrick Nagel" and "from the Playboy Collection" are literally true. Nagel created these works. *Compare PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 271–72 (2d Cir. 1987) (claims that albums "featured" Jimi Hendrix constituted false advertising where

Hendrix appeared as background performer). All of the works were associated with and appeared originally in *Playboy*. The often cited purpose of the Lanham Act is to protect consumers and competition from misrepresentation; accordingly, when advertising is false on its face, no evidence of public confusion is necessary to succeed on a Lanham Act claim. *Id.* at 272. Here, there is nothing from which to protect consumers in the advertisements on their face, other than perhaps the implication of a continuing association between Nagel's estate and Playboy. And these competitors are protected by the copyright laws; the question in this case is not that the posters are Nagel's works, but who owns the rights to produce them.

██ The court also concludes that there were no Lanham Act violations based upon alterations of the works in the Nagel Collection, although for reasons of the insufficiency of the evidence. In *Gilliam*, the defendant had broadcast programs that had been performed and written by members of the "Monty Python" comedy group, but which the defendant had edited without consent into a form that departed substantially from the original works. Because such "deformation" presented the creator as making a work that was not truly his or her own, it is the artist "who suffers the consequences of mutilation, for the public will have only the final product by which to evaluate the work. Thus, an allegation that a defendant has presented to the public a 'garbled,' distorted version of plaintiff's work seems to redress the very rights sought to be protected by the Lanham Act . . . ." *Gilliam*, 538 F.2d 14, 24–25 (citations and footnotes omitted). At trial, Staebler testified that alterations were made to four of the ten posters: on three, a woman's breast was covered; on the fourth, only the top half of the work was used in the poster. Tr. 671.

A Lanham Act claim may be found if an alteration constitutes "a false reference to the origin of a work, or a reference which, while not literally false, is misleading or likely to confuse." *King*, 976 F.2d at 828; *see Benson v. Paul Winley Record Sales Corp.*, 452 F.Supp. 516 (S.D.N.Y.1978) (defendants "deceitfully packaged and advertised" early

recordings of acclaimed musician released five to twelve years later as "new" misled public); *Rich, supra.* In the recent case of *Lish v. Harper's Magazine Foundation,* 807 F.Supp. 1090 (S.D.N.Y.1992), in relevant part, a writer brought a Lanham Act claim on the grounds that a letter written by the plaintiff and edited and published by the defendant had made the letter no longer a work of the author. The court first concluded that the defendant's representation that the letter was by the plaintiff was true because the published letter did originate with the author; the final form was taken in its entirety from the original with no additions or changes, but only deletions. The court then established that "the burden is on [the plaintiff] to prove by a preponderance of the evidence that a false message was communicated to a not insubstantial portion of the relevant audience ..." *Id.* at 1107. As in *Lish,* here the parties seeking relief under the Lanham Act did not sustain their burden. Defendants offered no objective evidence which established the reaction of the public to these alterations. Nor was there any evidence to the contrary of Staebler's characterization that the alterations were "very minor." Tr. 670–71. Accordingly, the defendants have not proven by a preponderance of the evidence that the alterations on four of the posters have converted or "garbled" Nagel's works into something new. The court therefore finds that Playboy's titling and promotion of the Collection is not false on its face and that Dumas and JDI have failed to show that the alterations in the posters are substantial enough to mislead the public as to the posters' origins. The Lanham Act counterclaims are therefore dismissed.

## IV. ESTOPPEL

Playboy makes the argument that defendants are estopped from disputing PEI's ownership of the copyrights in Nagel's works. Plaintiff cites a variety of cases for the legal principle that a party who has engaged in particular conduct and has accepted benefits of that conduct cannot later adopt positions inconsistent with that conduct for subsequent advantage. Playboy then relies on a second set of cases for the proposition that where a party would have been estopped from making certain assertions, the party's decedents are similarly estopped. According to Playboy, defendants are estopped here because Nagel "was clearly aware of, and personally and repeatedly acknowledged and confirmed" PEI's all rights terms, and knew of PEI's use of his work in outside magazines and the Putnam book *The Playboy Advisor;* yet he never registered an objection. Pl.Post Trial Mem. at 39.

This argument is without merit. First, there is no indication of what Nagel "clearly knew." If Playboy had such evidence, they did not introduce it at trial. The core of this dispute is not that agreements were entered, but what the effect and scope of those agreements were. Second, there was insufficient testimony as to whether he was paid for the work appearing in the Putnam book or whether he received "honoraria" for republication of his work in foreign editions. Furthermore, the most blatant exploitation by Playboy of Nagel's works began after commencement of this suit by Playboy when SEL began publishing the Collection. The court notes also that this suit did not arise out of conduct by the defendants; rather, plaintiffs brought a declaratory action without any alleged infringing behavior on the part of the defendants. To allow the plaintiffs to use estoppel as a sword would suggest that the entire litigation was premature. For these reasons, the court does not consider the doctrine of estoppel applicable here.

## V. RELIEF

### A. Injunction

Having succeeded on the merits, defendants are entitled to relief. Because the copyrights in the artworks that comprise the Collection do not belong to Playboy and constitute copyright infringement, and because there is no evidence that Nagel intended to allow Playboy to exploit his artworks in the form of the Collection, Playboy is hereby permanently enjoined from manufacturing, distributing or selling posters from the Collection. 17 U.S.C. § 502 (1993).

### B. Actual Damages and Profits

Dumas also seeks "actual damages and any additional profits of [Playboy]." 17 U.S.C.

§ 504(a)(1). Before trial, Dumas indicated that instead of showing actual damages only "a reasonable license fee with respect to Playboy's infringements" would be sought on these grounds. Def.Pre-trial Mem. at 65. As evidence of a reasonable license fee, Dumas introduced two license agreements which JDI and Dumas have entered with third parties for reproduction of Nagel's works. These agreements suggest that the defendants receive between 20 and 30 percent of either the gross profits less expenses or of the unit retail price. *See* Def.Exh. BC, BD. Before addressing the issue of the license fee, the court examines Playboy's profits.

The 1976 Act provides, "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b) (1993). "If the infringer 'does not assume this burden, or if its attempt to do so is found unacceptable by the court ... then the "gross figure is left to stand as the profit factor." ' " *Business Trends Analysts v. Freedonia Group, Inc.,* 700 F.Supp. 1213, 1240 (S.D.N.Y.1988), *aff'd in part, rev'd in part* 887 F.2d 399 (2d Cir. 1989) (citation omitted). Where the infringer's records of costs are inadequate, any doubt must be resolved in favor of the copyright owner. *Id.* At trial, Playboy introduced evidence that the gross receipts of the Collection as of March 31, 1993 were $76,-838.00. Dumas does not dispute this amount. Playboy also introduced evidence which purported to show that the total costs attributable to the posters were $234,314.05. See Pl.Exh. 50. Playboy therefore asserts that there is no profit whatsoever.

The breakdown of the costs is as follows: $20,093.05 for third party advertising; $29,-600.00 for "house ads" in *Playboy;* $10,-477.00 for art shows displaying the posters; $9,822.00 for travel and entertainment; $46,-195.00 for attributed costs of SEL salaries and overhead; $13,500.00 for attributed costs of PEI salaries and overhead (for Staebler and Kerig Pope); and $104,627.00 for production of all posters. The plaintiffs also indicated that $14,387.00 was attributable to the production costs for the posters sold to date. Pl.Exh. 50.[25]

Some of these figures are based on estimates and speculations. For example, Staebler testified that the $46,195.00 attributable to SEL employees was arrived at by taking 20 percent of the SEL payroll. Tr. 193. Similarly, the $13,500.00 attributable to him and Pope are five percent of their salaries paid by PEI since the Collection began. *Id.* These estimates were made by Staebler after "the accounting department gave me the expenses and on those areas where you have to allocate it." Tr. 673. He then sat down with the vice-president of SEL and made the allocation. *Id.* The court does not know what information the accounting department gave Staebler or what exactly his estimates were based upon. Other than the estimation of production costs for posters sold, no efforts were made to distinguish between estimated costs related to current sales and costs that might relate to future sales. Tr. 197–198. Furthermore, Staebler testified that since 1992 there were no increases in overhead and salaries that were due to the SEL publication of Nagel posters. Tr. 674. Precedent in this circuit is that where an infringer's evidence as to "which and how much each item of overhead contributed to the sales of the infringing items, [the infringer] is not allowed to deduct any of its indirect and overhead expenses from its gross revenues." *With Love Designs Inc. v. Dressy Tessy, Inc.* 25 U.S.P.Q.2d 1880, 1884 (S.D.N.Y.1992). The court therefore excludes the general amount for both SEL and PEI salaries and overhead from the calculation of costs.

Similarly, for lack of competent evidence, the court excludes from the calculation costs attributed to the art shows and travel and entertainment expenses. Regard-

---

**25.** The record is unclear as to whether Plaintiffs' Exhibit 50 was ever properly moved into evidence. The court hereby deems it admitted, with full awareness of the hearsay problems inherent within it. Tr. 190–192.

ing the art shows, Staebler said that there was a small show in New York at which only Nagel prints and art watches were displayed. He testified that 50 percent of that show's costs were attributed to the $10,477.00. The second show was the Art Expo in New York in which Playboy had four booths, one of which was devoted to Nagel. Staebler could not be specific as to what portion of the Expo's costs were used to reach the $10,477.00 figure. "I think in the Art Expo we didn't use 25 percent. I think we actually used 20 percent." Tr. 192. The court cannot give weight to this testimony, particularly where there is no evidence of even the underlying cost of either art show. There is also no breakdown of the travel and entertainment expenses. The court does not doubt that Playboy incurred costs in terms of salaries, overhead, the art shows, and travel. But without evidence, the court would be remiss in giving weight to these estimates.

For third party advertisement and promotion, plaintiffs submitted invoices from five different publishing companies for preparation for advertisements. Each refers to Nagel or to one of the Playboy names for a Nagel work. *See* PTM Stip.F. ¶ 71. The earliest of the invoices is dated June 4, 1992.[26] All but two are for full page 4 color ads with bleed. Of the remaining two, the invoice indicates that it is for "PATRICK NAGEL AD/PLATE READY FILM, FUJI AND DXLUX [sic] PROOFS." The other invoice from Lithcor Incorporated merely indicates that it is for "REPRINT–PAT NAGEL" and "8% OVERS." The quantity for the reprints is 3,000 and the quantity for the

overs is 250; given that the total for this order is only $1561.83, the court concludes that they too are for some form of advertising, and not attributable to the poster production. The court therefore accepts the $20,093.05 as a legitimate deduction for costs attributable to the posters.

However, for the "house ads" in *Playboy*, plaintiffs submitted no invoices, bills, accounting records, or the ads themselves. Staebler testified only that SEL was "billed the actual production costs of putting the page in the magazine." Tr. 191. Again, because of the insufficiency of the evidence the alleged costs of the in-house advertisements will be excluded. *See In Design v. Lauren Knitwear Corp.,* 782 F.Supp. 824, 832 (S.D.N.Y.1991). Aside from the lack of evidence, the court excludes the amount attributed for a second reason. PEI is the parent of SEL and there is no indication that the amount charged SEL is not merely cost-shifting. *See With Love Designs* 25 U.S.P.Q.2d at 1884 (10% agent's fee to parent company disallowed where there was no demonstration that fee was determined in arms-length negotiations).

Finally, with regard to production costs, the court includes only that amount attributable to the posters sold. *Dolori Fabrics, Inc. v. Limited, Inc.,* 662 F.Supp. 1347, 1356 (S.D.N.Y.1987).[27] Thus the court allows $14,387 to be deducted from the gross receipts. The court therefore finds that Playboy's profits through March 31 to which defendants are entitled total $42,357.95 ($76,838.00 − $20,093.05 − $14,387.00 = $42,357.95).[28] Plaintiffs are directed to sub-

---

26. One invoice from Commerce Publishing Co. is dated October 9, 1991, but this appears to be a typographical error. The invoice indicates "DECOR December 1992" and the stamp of receipt is October 20, 1992. Pl.Exh. 50, p. 9.

27. The court notes that the figure for production costs is based on scant evidence. However, defendants make no direct objection to the amount attributed to the posters sold as of March 31. Furthermore, simple math shows that the production costs would thus account for roughly 18.72 percent of the gross receipts ($14,387/$76,838 = .18723), which the court finds to be reasonable.

28. Plaintiffs have made a brief argument against any deduction. In a two sentence argument,

they assert that even if Staebler's proof was insufficient to prove the exact expense in producing the Collection, "SEL nevertheless 'should be allowed to deduct an amount equivalent to the minimum amount [it] in all likelihood spent on the [posters].'" Pl.Post–Tr.Reply Mem. at 47 n. 9 (quoting *Sygma Photo News, Inc. v. High Society Magazine,* 778 F.2d 89, 93 (2d Cir.1985)). At a minimum, it is apparent that the cost of producing the ten high quality posters, advertising and promoting them, and showing them at two art shows, etc., fully consumed the total gross receipts derived from their sale, thus leaving no profit." Pl.Post–Tr.Reply Mem. at 47 n. 9. The Court disagrees. In *Sygma* the court allowed deductions from profits for those expenses adequately linked to production of the infringing

mit evidence of additional sales and expenses incurred since March 31, 1993 in order to establish the final award.

Returning to the question of a reasonable license fee, in the post-trial submissions, defendants urged that the court award 30 percent of the gross receipts, or $23,051.40. However, defendants also recognize that any license or royalty fee would be deducted from the profits to prevent double recovery. Def.Post–Tr. Mem. at 58 n. 23. Because the award of profits exceeds defendants' largest request for a license fee, the court does not need to further address what would constitute an adequate license fee for Dumas.

### C. Recovery Under the Parties' January 1993 Agreement

■ Dumas further requests $10,402.50 from plaintiff SEL. The basis of this claim is a settlement agreement from an action by all the parties in this suit against Mirage Editions, Inc. in the Central District of Illinois. The agreement was executed on January 29, 1993 by Dumas and on February 1, 1993 by Playboy. In ¶ 4.B of that agreement, the parties agree in relevant part that Dumas and JDI reserve the right to seek relief with respect to $10,402.50 that was collected by SEL from Mirage under the Litigation Settlement, "the ultimate rights to which the parties agree will be determined by the ... action in the Southern District of New York." Def.Exh. DC, p. 5. The court here merely determined the issues that the parties in the Illinois case agreed would be controlling. Enforcing the terms of that settlement agreement, however, is not this court's task. While the fate of the $10,402.50 may be determined by the court's ruling here, the parties that seek execution of that agreement must bring the appropriate action in the proper forum to enforce their rights if the other parties do not comply.

### D. Attorney's Fees

Dumas also seeks attorney's fees. Under section 505 of the 1976 Act, the court, in its discretion, may award the recovery of full costs and a reasonable attorney's fee to the prevailing party. Dumas seeks fees with regard to the issue of copyright ownership. She also seeks 80 percent of the attorney's fee for work with regard to her copyright infringement claim. The basis for this latter figure is that eight of the ten Nagel works used in the Collection were registered by Dumas before the commencement of this litigation.

■ In this circuit, section 505 has been applied differently with regard to plaintiffs and defendants. "Plaintiffs who prevail are awarded fees as a matter of course. Defendants on the other hand, will recover if 'plaintiff's claims are objectively without arguable merit' or 'baseless, frivolous, unreasonable or brought in bad faith.'" *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 457 (2d Cir.1989) (quoting *Roth v. Pritikin,* 787 F.2d 54, 57 (2d Cir.1986)). With regard to the determination of copyright ownership, Dumas and JDI were defendants. This case involved the construction of legend agreements in light of custom and usage of the magazine industry. There were questions of first impression with regard to whether a retroactive writing satisfies the definition of work made for hire in section 101(2) and whether California Civil Code section 982 applied under the circumstances of this case. The issues were difficult and time-consuming. Under these circumstances, the court declines to award Dumas any attorney fees on the basis of the issue of copyright ownership.

■ The court reaches a different conclusion with regard to the prosecution of the infringement claim. For that case, Dumas and JDI were in effect plaintiffs, as the issue of infringement arose as a counterclaim. Particularly important in this court's judg-

---

material. In the instance to which plaintiff refers, the court allowed a deduction of 50% of the price the infringer claimed was spent on the photographs used in its magazine. In this case, the court has allowed a deduction of roughly 40% of the advertising budget that plaintiff

claims it spent. As to the art shows and the travel and entertainment expenses, there was no evidence of their existence or amounts; nor were they "linked with production costs in any satisfactory form." *Sygma Photo News, Inc.,* 778 F.2d at 93.

ment is the fact that the infringing behavior commenced after Playboy, the original plaintiff in this action, had brought suit. As Dumas correctly points out, the 1976 Act prohibits the award of attorney's fees under section 505 in an action for "any infringement of copyright commenced after first publication and before the effective date of registration...." 17 U.S.C. § 412(2). The court thus applies the 80 percent formula suggested by Dumas. The court notes that this award of fees should be relatively minor, as it relates only to the preparation of Dumas's attorneys with regard to the infringement counterclaim. As Dumas noted, "[T]he determination of which party owned the copyrights in the Nagel artworks that first appeared in *Playboy* was the most significant portion of the litigation...." Def. Post–Tr. Mem. at 62.

■ The question of attorney's fees under the Lanham Act was addressed only in the pre-trial submissions. The Lanham Act allows the court to award a reasonable attorney's fee to the prevailing party "in exceptional cases." 15 U.S.C. § 1117. There is nothing in the record that would warrant considering this case to be "exceptional" within the meaning of that statute. Attorney fees for either party under the Lanham Act are therefore denied. *See Imaf, S.p.A. v. J.C. Penney Co., Inc.,* 810 F.Supp. 96 (S.D.N.Y.1992).

### CONCLUSION

For the forgoing reasons, plaintiffs' claim for a declaratory judgment that they are the sole owner of all right, title, and interest including copyright in the Nagel artworks that are at issue in this suit is dismissed. Defendants' counterclaim for copyright infringement is granted. Defendants' Lanham Act claim is dismissed. Plaintiffs are enjoined from manufacturing, distributing, or selling posters from "The Playboy Collection by Patrick Nagel." Plaintiffs are further directed to pay defendants $42,357.95 as profits gained from their infringing activities. Plaintiffs are directed to submit proof of any additional gross receipts earned from sales of posters in the Collection after March 31, 1993. The court directs Dumas to submit proof of the reasonable attorney fees in preparation of its infringement claim. Defendants are further directed to submit a final judgment in conformity herewith. This Opinion shall constitute the findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

SO ORDERED.